**UNITED STATES of America, Appellee,**

v.

**Lee A. LANIER, Appellant.**

**No. 77–1448.**

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 12, 1977.

Decided June 7, 1978.

Theodore S. Schechter, Clayton, Mo., for appellant.

Michael W. Reap, Asst. U. S. Atty., St. Louis, Mo., for appellee; Robert D. Kingsland, U. S. Atty., on the brief.

Before LAY, BRIGHT and HENLEY, Circuit Judges.

LAY, Circuit Judge.

Lee A. Lanier was found guilty by a jury in the United States District Court for the Eastern District of Missouri on three counts of a five count indictment charging that he violated 18 U.S.C. § 1001.[1] The district court, the Honorable James H. Meredith presiding, sentenced the defendant to four years imprisonment on each count, to be served consecutively, and in addition imposed a $10,000 fine on each count. On appeal the defendant urges that reversal of his conviction is required because (1) the evidence was insufficient in a number of particulars; (2) the trial court erred in refusing to grant a requested continuance; (3) the trial court erred in refusing to require the government to give notice of certain evidence to be used at trial; and (4) a number of the trial court's evidentiary rulings constitute reversible error. We have thoroughly reviewed the record and find no prejudicial error.

I. *Background.*

The charges against the defendant resulted from his activities as a vendor of food stamps in the State of Missouri. The defendant and his partner, Richard Watkins, owned a corporation called Moneytown, Incorporated. Through a number of locations primarily in the St. Louis area Moneytown offered a variety of financial services to its customers and disbursed food stamps to eligible individuals. In October of 1975 an extensive shortage of funds was discovered with regard to the food stamp operation of Moneytown. A subsequent investigation indicated that certain monthly reports submitted by Moneytown had listed numerous bank deposits which had not in fact been made. The indictment involved in this appeal was later returned, charging that by submitting the reports the defendant had knowingly and willfully made a false statement in a matter within the jurisdiction of a federal agency.

The federal food stamp program is administered through the United States Department of Agriculture (USDA). The USDA contracts with each state for the disbursement of food stamps. In Missouri the Division of Family Services is the state agency responsible for administering the food stamp program. The Division of Family Services accomplishes the disbursement of food stamps by contracting private businesses such as Moneytown to serve as food stamp vendors.

Moneytown's function as a vendor included disbursing food stamps to individual purchasers in return for "Authorization to Purchase" (ATP) cards and a designated amount of money. The ATP cards were issued to persons eligible to receive food stamps, and indicated the number of stamps to which the recipient was entitled as well as the amount of cash which the recipient was required to pay for the stamps. In addition to actually disbursing the stamps, Moneytown was responsible for a number of bookkeeping functions with regard to the stamps disbursed and the cash received. Moneytown was also required to deposit the funds received from the sale of food stamps in the Federal Reserve Bank of St. Louis for credit to the account of the Food and Nutrition Service, the division of USDA specifically designated to administer the food stamp program. Deposits were to be made daily if cash received equaled $1,000 or more. For receipts of less than that amount deposits were to be made upon accumulation of $1,000, or once each week for receipts totaling less than $1,000 per week.

As a vendor Moneytown was required to complete a daily "FS 20" form which included information as to the total number of stamps disbursed, and the total ATP cards and cash received each day. A

---

1. Title 18 U.S.C. § 1001 provides:
   Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

monthly report tabulating the daily totals was to be completed on a form denominated "FNS 250." In addition, the FNS 250 form was to include a listing of all deposits made to the Federal Reserve Bank by the vendor for the month. All ATP cards received by Moneytown were returned to the state office, computer tabulated and later reconciled against the figures listed on Moneytown's FNS 250 forms. The FNS 250 form was the monthly accountability form eventually sent to the Food and Nutrition Service in Washington, D. C., for auditing purposes.

During the early stages of Moneytown's operation as a food stamp vendor numerous errors became apparent in the FNS 250's submitted by Moneytown when the forms were checked against the ATP card totals compiled at the state headquarters. It also became apparent that Moneytown was not in compliance with the time requirements for deposit of funds collected in return for stamps issued. Due to the fact that Moneytown's system of bookkeeping was leading to inaccuracies in the information listed in the records of its food stamp operation, representatives of the Missouri Division of Family Services went to the Moneytown office each month after May 1975 to assist in the preparation of the FNS 250 forms. In each instance the state employees would prepare a tabulation based on Moneytown's weekly submission of accumulated FS 20 reports, and would go to Moneytown's office at the end of the month to aid Moneytown employees with the preparation of the FNS 250 form.

The FNS 250 forms filed by Moneytown for the months of May through September 1975 contained the statements which formed the basis of the indictment in this case. It is undisputed that the FNS 250 forms filed by Moneytown for those months listed deposits to the Federal Reserve Bank in amounts which reflected the amount of cash received by Moneytown as determined by the number of stamps disbursed and the ATP cards receiving during the period. It is likewise undisputed that the computer records of deposits actually made to the Federal Reserve Bank from June through September 1975 listed no deposits from Moneytown.

The indictment against Lanier charged him with falsely stating the amount of deposits on the FNS 250's for the months of May, June, July, August and September 1975. The forms for May and June were signed by state employees after preparation by them, and the defendant was acquitted on Counts I and II, which were based on those forms. Lanier signed the FNS 250's for July, August and September after being requested to do so by employees of the Missouri Division of Family Services. Guilty verdicts were returned on Counts III, IV and V, based on those forms.

## II. *Sufficiency of the Evidence.*

The defendant's first major contention is that the government's evidence was insufficient to support a conviction under 18 U.S.C. § 1001, and that his motion for acquittal, made at the close of the government's case and again at the conclusion of the evidence, should have been granted. We disagree. As the statute itself suggests, the essential elements of an offense under 18 U.S.C. § 1001 include (1) making, or causing to be made, a false statement in relation to a matter within the jurisdiction of an agency of the United States; (2) knowledge that the statement was false; and (3) knowing and willful conduct on the part of the defendant.[2] *See Bryson v. United States,* 396 U.S. 64, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969); *United States v. Adler,* 380 F.2d 917, 920 (2d Cir.), *cert. denied,* 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1967). In determining whether the defendant's motion for acquittal should have been granted, we must review the evidence in the light most favorable to the government and draw all reasonable inferences in support of the jury verdict. *See Glasser v.*

---

**2.** This circuit has also included the requirement that the statement be material, *see Brethauer v. United States,* 333 F.2d 302, 306 (8th Cir. 1964), but the defendant makes no contention that the statements made in the present case were not material.

*United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed.2d 680. (1942); *United States v. Bass,* 472 F.2d 207, 213 (8th Cir.), *cert. denied,* 412 U.S. 928, 93 S.Ct. 2751, 37 L.Ed.2d 155 (1973).

### A. *Making the Statements.*

■ Lanier first urges that the evidence was insufficient to prove that he made the allegedly false statements. He argues that the statements made on the FNS 250 forms related to the operation of Moneytown as a food stamp vendor, were submitted on behalf of Moneytown and were signed by the defendant only in his capacity as a corporate officer of Moneytown. He contends that any violation of 18 U.S.C. § 1001 should have been charged against the corporation rather than the defendant personally. As support for this contention the defendant relies upon *United States v. Lange,* 528 F.2d 1280, 1288 (5th Cir. 1976), wherein the Fifth Circuit stated: "[W]e do not equate a statement issued by and in the name of a corporation with a statement by an individual." In *Lange,* however, the court qualified its holding with the following caveat: "[U]nless there is some evidence from which a jury could reasonably conclude that, at the time of signing this affidavit, *Lange knew or should have known it to be false* and intended to deceive by making one or both of the statements, a directed verdict of acquittal was required." *Id.* (emphasis added). The record here shows that Lanier took an active part in operating the business and knew about and participated in the fraud on the government. *See United States v. Bass, supra.* We therefore conclude that the defendant was properly charged in his individual capacity under the statute.[3]

■ Defendant next argues that proof was insufficient that he made the false statements or caused them to be made because the figures on the FNS 250 forms were compiled by the state officials, and his

signature alone was insufficient evidence that he made the statements. However, ample evidence established that the defendant knew of the deposit requirements and that he knew that the deposits listed on the forms had not been made. There was direct testimony by the witness Vivian Parker, a former employee of Moneytown, that Lanier had given her directions to make false reports of deposits and to forge false money orders to corroborate those reports.

Vivian Parker provided the key testimony establishing the defendant's individual complicity in the crime. After May 1975 she was the Moneytown employee responsible for compilation of the required reports for the food stamp operation. Parker testified that Lanier told her to figure the totals as required for completion of the forms and to prepare copies of money orders reflecting the amounts which should be deposited each day. She was never to actually deposit the funds without permission from the defendant, however. Furthermore, when the state officials came to the Moneytown offices at the end of the month to supervise completion of the FNS 250 forms she was to show them the bogus money order copies when asked about deposits.

Parker testified that the defendant told her in May 1975 that a $500,000 float had to be maintained at the United Missouri Bank of Ferguson and that under no circumstances were deposits to be made without his knowledge. Parker also testified that when she informed the defendant in June 1975 that no deposits had been made for May and June of that year he said: "The federal government must be farther behind than I expected. They must be at least 60 days behind instead of 30 in auditing."

We find that the testimony of witness Parker, if credited by the jury, was sufficient to support the conclusion that the defendant made, or caused to be made, the false statements charged in the indictment.

---

**3.** In addition, Judge Meredith instructed the jury that a person who aids and abets criminal activity is as guilty as the principal. Lanier, as a knowing corporate officer, could be held personally responsible for the acts of Moneytown as an aider and abettor. *See Nye & Nissen v. United States,* 336 U.S. 613, 618–19, 69 S.Ct. 766, 93 L.Ed. 919 (1949).

■ Recognizing that the credibility of witnesses is generally to be determined by the jury, Lanier urges that Parker's testimony was so inconsistent that this court should discredit it as a matter of law under the theory set forth in *Mesarosh v. United States,* 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956). This is not the first time such an argument has been presented to an appellate court. A similar contention was made in *United States v. Tanner,* 471 F.2d 128 (7th Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220 (1972), where the court stated:

> Appellate review of credibility is prohibited absent extraordinary circumstances. In *Mesarosh v. United States,* 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956), the testimony of a government informer was held to have so tainted the proceedings against the defendants as to require a new trial with the challenged testimony excluded. *Mesarosh,* however, was not dealing with appellate review of a jury's prior determination of credibility. The witness in question was shown to have perjured himself on several occasions subsequent to the trial, information which was obviously unavailable to the jury. Moreover, it was the Government who raised the challenge to the credibility of its own witness. In *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 394 (1966), a case more directly in point, the Court rejected the claim that the testimony of the principal government witness be held incredible as a matter of law, even where the witness was a paid informer who had contacted the Government while in prison, received clemency for his services and then ingratiated himself to the defendant in order to report on defendant's activities. The Court concluded that, however strong this informer's motives to lie may have been, "[t]he established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." 385 U.S. at 311, 87 S.Ct. 408.

*Id.* at 135–36 (footnote omitted).

In *United States v. Miles,* 472 F.2d 1145, 1146–47 (8th Cir.), *cert. denied,* 412 U.S. 907, 93 S.Ct. 2299, 36 L.Ed.2d 972 (1973), this court observed that the credibility of witnesses is to be determined by the jury, even where strong impeaching testimony has been presented. *See also United States v. May,* 419 F.2d 553, 554–55 (8th Cir. 1969).

All the weaknesses in the testimony of Parker cited by the defendant were pointed out to the jury in an extensive cross-examination. Furthermore, certain key parts of Parker's testimony were corroborated by other witnesses.[4]

We thus conclude that the testimony of Vivian Parker created a jury question as to the defendant's complicity in the crime charged, and was sufficient to support a finding that he made the statements or caused them to be made.

**B.** *Falsity of the Statements.*

■ The defendant next contends that the government introduced insufficient evi-

---

4. For example, Ethel Edwards, a co-worker, testified that Parker had told her about the defendant's instructions with regard to the deposits. Mark Damron, a Moneytown employee, testified that the defendant had mentioned "float" to him; he further testified that he and the defendant were aware of the deposit requirements.

A number of witnesses testified as to a $307,000 deposit made by Moneytown employee Vivian Martain on May 9, 1975, to cover part of the receipts for April 1975, and a $186,000 deposit made around May 15, 1975, to cover the receipts for the first half of May 1975, which apparently caused the Moneytown account to be overdrawn. As a result, the defendant became so upset he fired Martain and replaced her with Vivian Parker. Parker's first duty was to stop payment on the second deposit made by Martain.

The government argues that this testimony effectively negates the defendant's good faith defense since (1) money should have been available to cover the money orders drawn by Martain unless funds were being diverted; (2) the episode establishes the defendant's personal complicity in the practice of not making deposits as required; (3) the evidence establishes the defendant's knowledge of the circumstances; and (4) the defendant's failure to discuss the problem with representatives of the food stamp program indicates wrongful intent.

dence that the deposit figures listed on the FNS 250's were false. He urges that in accordance with instructions of state personnel, the deposit figures listed on the FNS 250's were only bookkeeping entries, intended to reflect the total receipts of the vending operation rather than deposits actually made to the Federal Reserve Bank. Defendant urges that the deposit totals corresponded to the correct totals figured at the state office after tabulation of the ATP cards and therefore the deposit figures cannot be said to be false. In connection with this argument, Lanier also asserts that since the FNS 250 forms did not label the deposits listed as deposits to a given bank, and in view of the state employees' acquiescence in Moneytown's repeated practice of making late deposits, the forms were ambiguous. Relying upon *United States v. Steinhilber,* 484 F.2d 386, 389–90 (8th Cir. 1973), and *United States v. Diogo,* 320 F.2d 898, 907 (2d Cir. 1963), defendant urges that, in view of the ambiguity, the government must negate any reasonable interpretation that would make the defendant's statements factually correct.

This argument overlooks the evidence that defendant had been informed on several occasions of the daily deposit requirements and knew that the figures listed as deposits were intended to reflect deposits actually made. Such evidence negates the fact that the defendant believed the deposit figures were intended only as bookkeeping entries reflecting a monthly tabulation of the totals listed on the FS 20 forms. The testimony of Parker as to the defendant's directions to maintain false money orders reflecting the totals allegedly deposited creates sufficient proof that defendant reasonably understood that the deposits were to be made in a bank. We find ample evidence from which the jury could conclude that defendant did not find the forms ambiguous.

## C. *Knowing and Willful Conduct.*

The defendant's final contention with regard to the sufficiency of the evidence is that there was insufficient evidence that he knowingly and willfully made the allegedly false statements on FNS 250 forms. He urges that since he did not personally compile the deposit figures listed on the forms, he would have had to rework the calculations himself before it could be said that he knew of the falsity of the statements and willfully submitted them. Such a contention is inconsistent with the direct testimony that the defendant knew that *none* of the deposits listed on the forms had been made. Thus, the mathematical accuracy of figures was not the real question. The evidence was sufficient to support the conclusion that the defendant knew of the falsity of the statements and submitted them willfully.

We are of the opinion that the evidence, taken in the light most favorable to the government, was sufficient to support the jury's verdict of guilty on Counts III, IV and V.

## III. *Pretrial Continuance.*

The indictment against the defendant was returned on March 3, 1977. At arraignment on March 7, 1977, the defendant entered a plea of not guilty to the charges and the case was set for trial on April 4, 1977. Within the one week period designated for filing motions the defendant moved for a 60-day continuance because of the complexity of the case and the voluminous documentary evidence to be examined. In response to this motion the trial court delayed commencement of the trial until May 2, 1977, but refused to grant any further continuance.

Asserting that the trial judge misapplied the time limits set by the Speedy Trial Act without considering the factors recognized in the Act as possible bases for a decision to grant a continuance,[5] the defendant con-

---

**5.** Title 18 U.S.C. § 3161(h)(8)(B) provides:

The factors, among others, which a judge shall consider in determining whether to

grant a continuance under subparagraph (A) of this paragraph in any case are as follows:

(i) Whether the failure to grant such a continuance in the proceeding would be likely to

tends that the refusal to grant a further continuance was reversible error. He argues that due to the short time between indictment and trial he was unable to adequately examine the documentary evidence relevant to the case. The defendant further contends that because of the lack of adequate time for trial preparation, he was unable to interview a number of witnesses who could have aided his defense. In support of this contention the defendant urges that, due to publicity surrounding the case and the government's repeated references at trial to the $1,000,000 missing from the food stamp funds collected by Moneytown, the real issue in the jury's mind was the implication that he had stolen the money. Therefore, he argues, his inability to fully examine the financial records of Moneytown and explain where the money had gone was highly prejudicial. We are not convinced that the time allowed by the trial court was inadequate for the defendant to fully examine Moneytown's financial records. Furthermore, even if the defendant had been able to explain fully where the funds had actually gone, the FNS 250 forms which formed the basis for the indictment would be no less false with regard to the deposits listed. Our examination of the record indicates that the government's references to the amount of money missing, or the amount misstated on Moneytown's FNS 250 forms, were relevant to negate the defendant's contention that he merely made a good faith mistake as to the amount of money deposited and was totally unaware that deposits were not being made.

The rule is well established that the decision to grant a continuance rests in the sound discretion of the trial court, *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964), and is reviewable only for an abuse of that discretion. *See United States v. Little*, 567 F.2d 346, 348 (8th Cir.

1977); *United States v. Sturgeon*, 501 F.2d 1270, 1275 (8th Cir.), *cert. denied*, 419 U.S. 1071, 95 S.Ct. 659, 42 L.Ed.2d 667 (1974); *United States v. Leach*, 429 F.2d 956, 963 (8th Cir. 1970), *cert. denied*, 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 151 (1971).

The trial court's decision not to grant a further continuance in this case was based in part on the fact that defendant's counsel had represented him for 17 months prior to the return of the indictment, and that the defendant had been in possession of the documentary evidence in question for more than a year prior to trial. Although the defendant argues that he was unable to begin examining the documentary material until the indictment was returned since he had no idea what would be relevant, defense counsel had represented the defendant before the Missouri legislature in committee hearings regarding the missing food stamp funds and had some notice of possible federal charges through search warrants and grand jury proceedings connected with the investigation prior to indictment. Furthermore, the documentary evidence in this case consisted of the financial records of Moneytown, with which the defendant could be expected to have some familiarity. We find that the trial court acted within the limits of its discretion in concluding that the defendant had been afforded an adequate time to prepare his defense and in refusing to grant a second continuance.

IV. *Notice of Evidence.*

█ Prior to trial the defendant filed a motion pursuant to Federal Rule of Criminal Procedure 12(d)(2) seeking an order directing the government to notify him of its intention to use any evidence discoverable under Rule 16 of the Federal Rules of Criminal Procedure. The trial court denied the motion and the defendant now asserts that

make a continuation of such proceeding impossible, or result in a miscarriage of justice.

(ii) Whether the case taken as a whole is so unusual and so complex, due to the number of defendants or the nature of the prosecution or otherwise, that it is unreasonable to expect adequate preparation within the periods of time established by this section.

(iii) Whether delay after the grand jury proceedings have commenced, in a case where arrest precedes indictment, is caused by the unusual complexity of the factual determination to be made by the grand jury or by events beyond the control of the court or the Government.

the ruling was reversible error because the provision of Rule 12(d)(2) should be considered mandatory.

Rule 12(d)(2) provides as follows:

At the arraignment or as soon thereafter as is practicable the defendant may, in order to afford an opportunity to move to suppress evidence under subdivision (b)(3) of this rule, request notice of the government's intention to use (in its evidence in chief at trial) any evidence which the defendant may be entitled to discover under Rule 16 subject to any relevant limitations prescribed in Rule 16.

It is apparent that the provision contemplates motions filed in preparation for actual or potential motions to suppress evidence. *Cf. United States v. Mitchell*, 540 F.2d 1163, 1168 (3d Cir. 1976) (Stern, J., concurring), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1119, 51 L.Ed.2d 547 (1977); *United States v. Turner*, 423 F.Supp. 959, 960 (E.D.Tenn.1976). It is also apparent from the record that the defendant's Rule 12(d)(2) motion was filed as a means of obtaining more specific discovery than that afforded by Rule 16.

The government fully complied with Lanier's Rule 16 motion for discovery and also specified which evidence would be used in the government's case in chief at trial. The defendant has made no showing in this court to indicate that because of the trial court's ruling on his Rule 12(d) motion his efforts to suppress inadmissible evidence were frustrated. In fact, defense counsel indicated at oral argument that the primary injury suffered due to the court's ruling resulted from the government's use of documentary evidence of specific financial transactions to impeach the defendant on cross-examination. Such evidence would not have been within the scope of a Rule 12(d) motion, since the rule applies only to evidence to be used in the government's case in chief. Furthermore, the government would not have been in a position to specify evidence to be used in cross-examination of the defendant until after the defendant had testified. For these reasons, we conclude that the trial court's denial of the defendant's Rule 12(d) motion does not require reversal here.

## V. Trial Errors.

### A. Submission of Counts I and II.

■ The jury acquitted the defendant of Counts I and II. The defendant urges that the submission of Counts I and II may have affected the jury's deliberation on Counts III, IV and V by allowing a trade-off or compromise. The court instructed the jury to consider each count separately. Although we agree that the trial court should not have submitted Counts I and II, we conclude that the verdict itself would indicate that the jury did give independent consideration to each count, and therefore find no prejudice. *See Chatman v. United States*, 557 F.2d 147, 149 (8th Cir.), *cert. denied*, 434 U.S. 863, 98 S.Ct. 195, 54 L.Ed.2d 138 (1977).

### B. Restricted Cross-examination.

■ The defendant raises several evidentiary issues. First, he alleges that the trial court improperly limited his cross-examination of the government's initial witness, Ewing B. Gourley, the former Director of the Missouri Division of Family Services. On direct examination Gourley testified as to the existence of a contract between the State of Missouri and Moneytown and stated over defendant's objection that under the terms of the contract Moneytown was to deposit receipts from the sale of food stamps in the Federal Reserve Bank. When the defendant attempted to cross-examine Gourley on the contract in order to establish breaches of the agreement by the State of Missouri, the trial court refused to allow the questioning. We agree with the trial court that any breach of the contract by the State of Missouri was irrelevant to the issue of defendant's guilt on the false statement charge. Under the circumstances we find no clear abuse of discretion or prejudice to the defendant. *See United States v. Dodge*, 538 F.2d 770, 782 (8th Cir. 1976), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 547 (1977).

### C. Negative Evidence.

■ Another evidentiary error asserted by the defendant is that the trial court

erred in refusing to strike the statement of the witness Art Baughman, a USDA auditor, concerning his audit of the Moneytown food stamp operation in September 1975. He testified that he could not find any deposits by Moneytown in the records of the Federal Reserve Bank for the month of June 1975. It is well settled that a witness may testify as to his failure to find certain records after search. *See United States v. Robinson*, 544 F.2d 110, 114–15 (2d Cir. 1976); *United States v. Jewett*, 438 F.2d 495, 497–98 (8th Cir.), *cert. denied*, 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 117 (1971); *United States v. De Georgia*, 420 F.2d 889, 891–92 (9th Cir. 1969); *Charron v. United States*, 412 F.2d 657, 660 (9th Cir. 1969); *McClanahan v. United States*, 292 F.2d 630, 636–37 (5th Cir.), *cert. denied*, 368 U.S. 913, 82 S.Ct. 193, 7 L.Ed.2d 130 (1961). This testimony clearly falls within the exception to the hearsay rule under Rule 803(7) of the Federal Rules of Evidence.[6] Furthermore, since the computer records of the Federal Reserve Bank containing a full listing of deposits made by food stamp vendors, including Moneytown, were placed in evidence, no prejudice resulted from Baughman's statement.

### D. Impeachment Evidence.

■ The defendant alleges that the trial court erred in refusing to admit a petition filed by Vivian Parker in a defamation suit instituted in state court against Lanier. During direct examination Vivian Parker stated that she had filed a suit but that it had subsequently been dismissed against the defendant on the advice of her attorney. On cross-examination the defendant intensively interrogated her concerning the details of the suit. The trial judge did not allow the defendant to read the allegations of the petition to impeach her, but permitted only general questioning on the allegations since the statements in the petition itself were those of Parker's lawyer rather than Parker. Defendant contends that he should have been allowed to introduce the petition to impeach Parker's testimony. In view of the extensive cross-examination allowed, the court's refusal to allow the petition itself into evidence was not an abuse of discretion. *See United States v. Qualls*, 500 F.2d 1238, 1240 (8th Cir.), *cert. denied*, 419 U.S. 1051, 95 S.Ct. 628, 42 L.Ed.2d 646 (1974).[7]

### E. Trial Judge's Comment.

■ Lanier also objects to a comment by the trial court that defendant's cross-examination on certain matters was "totally irrelevant to the whole thing." The colloquy took place during a bench conference, but the defendant felt that the comment was made in a loud enough voice to be heard by the jury and therefore moved for a mistrial. Although the judge refused to grant a mistrial he thereafter, upon the defendant's request, admonished the jury to disregard the statement. Under the circumstances we find that any error must be considered harmless in view of the overall record and the admonition that the court gave.

### F. Prior Consistent Statement.

■ The defendant's final evidentiary contention relates to the trial court's ruling allowing government witness Ethel Edwards, a co-worker of Vivian Parker, to testify as to a statement made to her by Parker in May 1975. After Parker testified that the defendant had directed her to draw money orders to show state employees but never to deposit the money orders without

---

**6.** Federal Rule of Evidence 803(7) provides that the following material should not be excluded by the hearsay rule:

Evidence that a matter is not included in the memoranda reports, records, or data compilations, in any form, kept in [the course of a regularly conducted business activity], to prove the nonoccurrence or nonexistence of the matter, if the matter was of a kind of which a memorandum, report, record, or data compilation was regularly made and

preserved, unless the sources of information or other circumstances indicate lack of trustworthiness.

**7.** It has been held that a witness' pleading in another action is to be considered a formal statement presumed to have originated with counsel and should be inadmissible to impeach the witness absent some proof of adoption by the witness. *See Hobart v. O'Brien*, 243 F.2d 735, 744 (1st Cir.), *cert. denied*, 355 U.S. 830, 78 S.Ct. 42, 2 L.Ed.2d 42 (1957).

his permission, the government called Ethel Edwards as a witness. She was allowed to testify over objection that Vivian Parker had told her that she (Parker) was to make no more deposits to the state unless authorized by Mr. Lanier. The defendant contends that this testimony should not have been admitted because it was a prior consistent statement. The government urges that the testimony is admissible under Federal Rule of Evidence 801(d)(1).

Rule 801(d)(1) provides that a statement is not hearsay if:

> The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive.

> . . .

*See United States v. Scholle*, 553 F.2d 1109, 1121 (8th Cir.), *cert. denied*, 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977).

In *Hanger v. United States*, 398 F.2d 91, 102–05 (8th Cir. 1968), *cert. denied*, 393 U.S. 1119, 89 S.Ct. 995, 22 L.Ed.2d 124 (1969), we recognized that the testimony of a third party may be used to introduce the prior consistent statement of a witness after impeachment has been used to assail the witness' testimony as a fabrication. In *Hanger*, the witness' prior statements, recorded in a third party's notes of an interview with the witness, were held admissible on redirect even though consistent with his testimony on direct examination because impeachment on cross-examination had raised the implication that the witness had fabricated his story. *See also United States v. McGrath*, 558 F.2d 1102, 1107 (2d Cir. 1977); *United States v. Dorfman*, 470 F.2d 246, 248 (2d Cir. 1972), *cert. dismissed*, 411 U.S. 923, 93 S.Ct. 1561, 36 L.Ed.2d 317 (1973). In the present case, the thrust of defendant's impeachment was to discredit Parker's testimony in its totality and there existed an implied charge of recent fabrication or improper influence or motive. We

conclude that Parker's statement to Edwards, made prior to the discovery of the missing funds and before the defendant had made any public statement implicating Parker in the loss, and thus before the motive to fabricate could have existed, was admissible under Rule 801(d)(1).

## VI. *Conclusion.*

This was an involved, complex case, well tried by both counsel. We are satisfied that the defendant received a full and fair trial. He was, of course, neither charged nor tried for embezzlement or misappropriation of funds. Neither the government nor the defendant proved what happened to the missing funds. Under the indictment proof as to what happened to the money was not necessary to sustain the conviction. Substantial evidence was introduced to establish that the defendant falsely represented that bank deposits were made when in fact they were not. The evidence is overwhelming to support his conviction on the crime charged.

Affirmed.