Lee A. Lanier, pro se.

Robert D. Kingsland, U. S. Atty., and Edward L. Dowd, Jr., Asst. U. S. Atty., St. Louis, Mo., for appellee.

Before BRIGHT, STEPHENSON and McMILLIAN, Circuit Judges.

PER CURIAM.

Lee A. Lanier appeals *pro se* from the district court's[1] denial of his "Motion for Arrest of Judgment." Lanier and his partner, Richard Watkins, owned a corporation called Moneytown, Incorporated, which disbursed food stamps to eligible individuals and offered a variety of financial services such as check cashing and the sale of money orders, bus passes and identification cards. Vendors of food stamps were required to file a monthly report, called an FNS 250, reflecting (1) the number of food stamps in the possession of the vendor on the first day of the month [opening inventory], (2) the number of food stamps received by the vendor during the month, (3) the number of food stamps sold that month, (4) the number of food stamps in the possession of the vendor at the end of the month [closing inventory], and (5) the amount of money deposited in the Federal Reserve Bank as a result of food stamp sales that month. In October, 1975, an extensive shortage of funds was discovered with regard to Moneytown's food stamp operation. Lanier was indicted on five counts of falsely stating the

**UNITED STATES of America, Appellee,**

v.

**Lee A. LANIER, Appellant.**

**No. 79–1569.**

United States Court of Appeals, Eighth Circuit.

Submitted March 10, 1980.

Decided March 14, 1980.

---

1. The Honorable James H. Meredith, United States Senior District Judge for the Eastern District of Missouri.

bank deposit figures on the monthly FNS 250 reports for May through September, 1975, in violation of 18 U.S.C. § 1001 and was found guilty by a jury of three of those counts. This court affirmed his conviction, *United States v. Lanier*, 578 F.2d 1246 (8th Cir.), *cert. denied*, 439 U.S. 856, 99 S.Ct. 169, 58 L.Ed.2d 163 (1978).

Lanier continues to assert his innocence and alleges that his conviction was procured by tainted evidence. More specifically, in his "Motion for Arrest of Judgment,"[2] he argued that he had found mathematical errors of large magnitude in one of the monthly FNS 250 reports and that those errors were evidence of a scheme to defraud the court and procure his conviction. He described the scheme as follows: the monthly report for December, 1974, reflects receipt during the month of $513,500 of food stamps for disbursement. However, that portion of the form detailing the origin of those stamps[3] accounted for only $181,500 in stamps, leaving a discrepancy of $332,000. Lanier argued that because the FNS 250s are interconnected, in that the closing inventory of one month is the opening inventory of the next month, the $332,000 discrepancy was carried forward indefinitely and was covered up by a "forced balancing" or padding technique; that is, the report was falsified to increase the amount of food stamps sold, so that the inventory would balance with the receipts. The importance of the falsification was that he was not obligated to deposit the amount of funds each month reflected on the FNS 250 because he had not sold as many food stamps as indicated on the form. He argues that the prosecutor's use of such patently fraudulent documents to convict him constituted a fraud upon the court.

The district court properly denied Lanier's motion. The five counts of the indictment were based on the May through September, 1975, FNS 250 forms. Each count alleged that Lanier falsely stated the amount of money deposited that month in the Federal Reserve Bank. That amount in turn was dependent solely on the number of food stamps sold that month. A discrepancy[4] on the December, 1974, form would not be relevant to charges arising out of the filing of forms in May through September, absent a showing of additional discrepancies in subsequent FNS 250 forms.

Lanier's original motion made no reference to other discrepancies. However, Lanier's brief and reply brief on appeal do contain extensive allegations of such additional discrepancies. The new allegations center around an FBI report listing deposits that had been made by Moneytown for the months September, 1974, through October, 1975. That report reflected $319,034.25 in deposits in May, 1975, $140,008.86 in June, 1975, $171,006.37 in July, 1975, and $45,020.25 in August, 1975. Lanier refers to that portion of this court's opinion affirming Lanier's conviction which states:

> It is undisputed that the FNS 250 forms filed by Moneytown for [the months of May through September 1975] listed deposits to the Federal Reserve Bank in amounts which reflected the amount of cash received by Moneytown as deter-

---

**2.** The district court treated Lanier's motion as a petition for post-conviction relief under 28 U.S.C. § 2255.

**3.** The stamps were transferred to Moneytown from various locations.

**4.** It should be noted that the discrepancy alleged by Lanier should be given little if any weight. The portion of the form detailing the transfers of food stamps to Moneytown is illegible in part and therefore Lanier's argument that there is a discrepancy is hardly conclusive. Furthermore, state employees, who had the responsibility of auditing the food stamp pro-

gram, testified that they received all ATP cards (Authorization to Purchase cards given to food stamp recipients—each card permitted the holder to buy a certain number of food stamps) from each food stamp vendor in the state and made independent hand counts of those cards. They found no unusual disparities between the hand counts and the figures on the monthly FNS 250s submitted by Moneytown, including December, 1974. This testimony refutes Lanier's contention that the amount of food stamps sold was padded on the FNS 250s for December, 1974, and thereafter.

mined by the number of stamps disbursed and the ATP cards receiv[ed] during the period. *It is likewise undisputed that the computer records of deposits actually made to the Federal Reserve Bank from June through September 1975 listed no deposits from Moneytown.* (emphasis added)

*Id.* at 1249.

Lanier argues on the basis of the FBI report that there is evidence that Moneytown did in fact make deposits for those months and that, although the amount of deposits was not as high as listed on the FNS 250 forms for those months, the padding of the FNS 250 forms resulted in an overstatement of the amount Moneytown actually owed so that Moneytown did in fact deposit what was owed.

The apparent inconsistency regarding bank deposits was resolved by testimony at trial. FBI Agent William Deal testified that deposits made during the months of June through September were for amounts owing in earlier months.[5] It was the practice of Moneytown employees to prepare money orders for the amounts owed the federal government for food stamp sales, but to hold those money orders until such time as the financial condition of Moneytown permitted their deposit in the Federal Reserve Bank. The money orders deposited in the months of June through September were all prepared and dated in earlier months. No deposit was made of the amounts owing for the months June through September until October, 1975. Thus this court's statement that no deposits were made for June through September as represented by Moneytown on the FNS 250s was an accurate one.

Furthermore, Lanier's claim of padding of the FNS 250s is not supported by the evidence.[6] State employees testified that they compared the actual number of ATP cards turned in by food stamp recipients with the number of food stamps sold as stated on the FNS 250 forms and that the figures matched closely.

Lanier also alleges several miscellaneous discrepancies, all of which are relevant to the amount of total deficit. These include that (1) State Auditor George Lehr found a total Moneytown deficit of $835,000 and then added to that deficit $186,000 in money orders on which stop payment orders had been issued by Moneytown; Lanier argues that the deficit figure of $835,000 included the $186,000 in money orders, and that the stop payment order decreased rather than increased the deficit; and (2) on November 3, 1975, the FBI seized $669,919 in food stamps; this amount was verified by the Missouri State Auditor's Office and by Moneytown; however, the FNS 250 for October, prepared by state employees, showed a closing inventory of $601,782.

These allegations, so far as they are comprehensible, relate to the extent of the deficit, not whether false statements were made on a particular FNS 250. As this court stated in *United States v. Lanier, supra,* 578 F.2d at 1253:

> [E]ven if the defendant had been able to explain fully where the funds had actually gone, the FNS 250 forms which formed the basis [of] the indictment would be no less false with regard to the deposits listed.

In summary, Lanier has failed to show that the conviction was based upon the fraudulent use by the prosecutor of false

5. Moneytown did deposit some of the sums owing for May during May.

6. Lanier's claims of padding center on the February and March forms. The FNS 250 report for February, 1975, had an ending inventory of $117,146 worth of food stamps. The opening inventory on the FNS 250 for March, 1975, was $548,000, a difference of $430,854. This is a sizable discrepancy, which is not fully ex-

plained in the record because it was not in issue. In March, 1975, the food stamp denominations were changed from $2, $3, $10 and $30 to $2, $7, $40, $50 and $65. All food stamp inventories from February, 1975, apparently were exchanged for new denominations in March, 1975, and Moneytown must have received additional inventories of stamps beyond the even exchange.

and misleading evidence. Therefore, his motion was properly denied.

Judgment is affirmed.