UNITED STATES of America, Plaintiff-Appellee,

v.

Roy GRIFFITH (82–1485), Gerald L. McKay (82–1495), Frank Ross Reynolds, III (82–1496), Defendants-Appellants.

Nos. 82–1485, 82–1495 and 82–1496.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 17, 1984.

Decided Feb. 27, 1985.

Rehearing Denied in No. 82–1495 March 22, 1985.

Rehearing and Rehearing En Banc in Nos. 82–1485 and 82–1496 Denied April 10, 1985.

---

David Steingold (argued), Detroit, Mich., for Roy·Griffith.

Michael S. Friedman (argued), Troy, Mich., for Gerald L. McKay.

Richard Paul Zipser (argued), Southfield, Mich., for Frank Ross Reynolds, III.

Leonard R. Gilman, U.S. Atty., Michael C. Leibson, Asst. U.S. Atty. (argued), Detroit, Mich., for the U.S.

Before KEITH, MARTIN and CONTIE, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

Defendants Griffith, McKay, and Reynolds appeal their convictions for activities related to a marijuana distribution scheme. All three defendants were convicted of operating a continuing criminal enterprise in violation of 21 U.S.C. § 848. Reynolds and McKay were convicted of conspiring to obstruct the Internal Revenue Service in violation of 18 U.S.C. § 371. Reynolds was convicted of three counts of tax evasion in violation of 26 U.S.C. § 7201, and McKay was convicted of two counts of tax evasion. The defendants challenge their convictions

because of inflammatory remarks made by the prosecutor to the grand jury, the petit jury's use of a dictionary to define an important legal term during deliberations, and a comment on Reynolds' failure to testify made by counsel for a codefendant.[1] For the reasons that follow, we affirm the convictions of all defendants on all counts.

The evidence at trial showed that Reynolds and Griffith were the primary organizers in a marijuana distribution network involving tons of marijuana and millions of dollars. Reynolds arranged for individuals to transport the marijuana from Florida and elsewhere to Michigan, where Griffith was in charge of distribution. Reynolds usually paid these individuals, although on occasion Griffith would pay them. Much of the marijuana was transported in a mobile home which had been purchased by Reynolds and in a van which had been bought and modified at Reynolds' direction. Reynolds also gave the drivers directions on where to take the marijuana and whom to contact upon arrival in Michigan.

Griffith and Reynolds provided money to Patrick Bolerjack to buy a "stash" house from which Bolerjack distributed marijuana to individuals approved by Griffith and Reynolds. Griffith and Reynolds owned the marijuana, set the selling price, and kept records of the sales. Griffith and Reynolds also gave marijuana to individuals to sell on a consignment basis.

McKay was a middleman in the distribution chain. Griffith supplied marijuana to McKay, who then provided marijuana to individuals who sold it on a consignment basis. McKay set the price for the sales and directed certain persons to perform tasks for him. These tasks included transporting marijuana, loading and unloading marijuana, carrying marijuana to be weighed, weighing and storing marijuana, and transporting, counting, and laundering money.

Defendants' first challenge to their convictions is based on comments made by Assistant United States Attorney Michael Leibson to the grand jury that returned the indictments on the 21 U.S.C. § 848 charges. Although the comments made by Leibson related only to Reynolds, McKay and Griffith claim that Leibson's inappropriate remarks also reflected on them because they had been characterized as Reynolds' "partners" throughout the grand jury proceedings.

Some background is necessary to a full understanding of the content and effect of Leibson's remarks. The grand jury returned indictments against Reynolds and twenty-one other individuals. From its inception, the grand jury's investigation focused on Reynolds as a possible violator of 21 U.S.C. § 848. During the course of the investigation, Reynolds was indicted for obstructing the section 848 grand jury. On October 3, 1981, nearly eleven months prior to the presentment of the indictments on August 28, 1982, Leibson made the following remarks to the grand jury investigating the section 848 violations:

"It has been a busy three or four weeks. While all of this is going on, we have Frank Reynolds. Frank is in jail at the moment without bond. About a month ago, month and a half ago, according to testimony that another Grand Jury, 80–3, heard last week, Greg Reynolds—you remember Brother Greg—he was here that day with his wife—was in his store in Ann Arbor. Frank came in in the early evening, punched him, was yelling 'Why did you go before the Grand Jury? Why didn't you get a lawyer? Have you read your transcript? Do you know what you said?' And then he got very specific, wanted to know, 'Why did you present me in such a bad light? Why did you tell them about my water bed business, about my assets?'

---

1. The defendants also claim that the word "organizer" in 21 U.S.C. § 848 is unconstitutionally vague; the ten-year minimum sentence imposed by 21 U.S.C. § 848 constitutes cruel and unusual punishment; graffiti on the exterior of the courthouse violated due process rights; and the evidence adduced at trial was insufficient to establish guilt on the charges of conducting a continuing criminal enterprise. Reynolds also claims that he was the victim of selective and vindictive prosecution. These claims are without merit.

He made a derogatory comment about Greg's wife. 'Why did she tell about the car and the trunk incident?' I think they are referring to that money over the fence business in the cemetery.

"Anyway, a good many things that Frank Reynolds should not know were said to you and very specific statements about the Grand Jury and he demanded $10,000 from Greg without precisely stating why. It is Greg's opinion, according to his testimony, that he is being asked because he caused Frank all these problems. Greg called the IRS as he was instructed to do should anything like this occur. We obtained a complaint charging him with obstruction of justice or threatening and intimidating a witness who had appeared before the Grand Jury. The matter was taken to Magistrate Komives who on hearing the general facts of the case found that Frank was not entitled to bond, as rare an occurrence in the Federal system as you are going to find. It is virtually unheard of to be given no bond. Magistrate Komives found that in his opinion, Frank Reynolds simply was a threat to the Grand Jury investigation, was a threat to the witnesses, and he wasn't going to tolerate it. The matter was appealed to Chief Judge Feikens. Judge Feikens had three different hearing dates set and heard testimony on three different days and upheld Magistrate Komives, finding the same thing, that the matter is serious, that a witness had been threatened, and that Mr. Reynolds poses a tremendous risk to the continued integrity of the investigation on the street. That matter has been appealed to the Sixth Circuit on an emergency basis. They have been sitting on it for a week which would seem to indicate to me that they are not likely to release Mr. Reynolds.

"The matter was indicted last week by 80–3. Mr. Reynolds has appeared before Judge Joiner now who has also upheld the one decision on the earlier matters. So he has now had three hearings before two District Judges and a Magistrate. All of them have denied him bond. That is set for trial October 22. If you have nothing better to do, come on down and watch the performance. It will only take about a day. There is only three witnesses involved. What will happen if he is convicted is, most likely at this point Mr. Reynolds will not be out of jail then either. We are having some indication that he has seen the future and understands its ramifications at this point. He has had tentative discussions through his attorney, plea negotiations. We have told him essentially that there is nothing we can offer him without knowing what he has got and that if he thinks about probation, forget it, and if he is thinking about an easy deal, he is going to have to give us the world and we don't think he has got it. If he does, all the better. In any event, he is not going to save us a lot of time one way or the other so that is where Mr. Reynolds is at the moment. He is sitting in Milan, not too thrilled about the whole thing.

"A JUROR: Question. How would he have known what his brother said?

"MR. LEIBSON: That is a good question. There are two possible ways—well, three possible ways. Greg could have told him. Greg denies he told him anything of the substance of the Grand Jury conversations. Frank incidentally says he did. Frank has not said that under oath subject to cross examination. That is the position he has taken that he knew about it because his brother told him. That is one possibility.

"Possibility two is that as the Agents go out and question witnesses, they ask them things that, if you know what the case is about, you can guess what the source of information was. However, at least two of the things in my estimation that Frank told about would not be things that have been asked of anybody else because they were things unbeknown by Greg. Therefore, he won't ask anybody else about them. So that is the alternative, that in some manner, in some way, Frank Reynolds has gotten a hold of those transcripts or some information from this Grand Jury and we are terribly concerned about that.

"When John McKay was here, there was an allegation that an attorney had been paid off. I don't think that is true but who knows?

"There are various other ways one could get those transcripts. You could have a Court Reporter, which is not likely in this case because they would first have to identify who the Reporter was and then get to them which is almost impossible to do. They have no idea who is recording for us and certainly no idea who was here on a given day. They could have paid somebody from the protective services organizations and somebody unconnected with the office to simply go through the files. It seems they could have bugged the rooms, I suppose the Grand Jury Room. These things are all possibilities. I don't think many of them are probable. There is something happening that we are not fully—we have not been able to grab a hold of. In some manner, these people are getting information they shouldn't have and again, whether it is through a process of deduction or it is through a process of outright theft, I do not know, or if Greg Reynolds is lying—if he is, he is going to be facing an indictment about that. Elizabeth definitely didn't tell him. I think from her appearance here, no question about that. So I don't know. That is one of the tangential things in this trial coming up, about why we want him in jail. At least it has been brought to Judge Feikens' attention that there is serious possibility of a leak here somewhere and the possibility of Frank on the street persists and we don't want to be any part of that if we can avoid it. Chief Judge Feikens is aware of that potential as is United States Attorney Robinson and if we ever find out how that is happening, who ever is involved in that is going to be back in here explaining it and will most likely get indicted for obstruction of justice themselves. We are just not going to tolerate that.

"The reason, incidentally, that was brought before you, that particular incident, was that it was happening so fast that we couldn't get you back here fast enough to have that testimony and the things that were related didn't directly re-late to anything that was presented to you. I would rather have preferred to have presented this to you but the time sequence wasn't right. We will give you in time the specifics of that, too. We will have the affidavit before you or maybe we will bring in Greg to go over that. What was testified to is now public as far as that aspect of it and it is going to be eminently clear at the time what he said. It is going to be interesting to see how the Jury reacts to this because on the surface it is simply an assault case but Frank is going to be under investigation for drugs and tax violations and who knows what all.

"THE FOREMAN: How did the Flint Journal get a hold of this? You have said so far—

"MR. LEIBSON: (Interposing) I am not sure how they did it. I have gotten two calls from them. One was early on in the investigation where a Flint Journal reporter called and said something to the effect, 'I understand that you are looking at something that would be of interest to us.' I told him I didn't really know what would be of interest to them. He wanted to know is it a Special Grand Jury. My response, there were not special grand juries meeting on the 8th floor. If you could figure out what that meant. That was it."

Reynolds claims that these remarks violated his fifth amendment right to a grand jury indictment and his sixth amendment right to effective assistance of counsel. He also asks that we order dismissal of the indictment under our supervisory powers.

■ Leibson's comments to the grand jury were unwarranted. Indeed, they were outrageous. We frankly cannot understand what makes an Assistant United States Attorney think he is justified in appearing before a grand jury and discussing ongoing plea negotiations and insinuating, without one shred of evidence, that a person under investigation may have "bugged" the grand jury room. Leibson's actions reveal more than ordinary disregard for professional norms of conduct. His actions reveal a total absence of the

critical self-reflection that must inform the actions of any person who would exercise the coercive powers of the state. Whatever we think of Leibson's actions, however, we must exercise the restraint that eluded Mr. Leibson.

In this Circuit, the law is clear that a court may not order dismissal of an indictment under its supervisory power unless the defendant demonstrates that "prosecutorial misconduct is a long-standing or common problem in grand jury proceedings in [the] district." *United States v. Nembhard,* 676 F.2d 193, 200 (6th Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 90, 78 L.Ed.2d 98 (1983); *see also United States v. Lamoureux,* 711 F.2d 745, 747 (6th Cir. 1983); *United States v. Markey,* 693 F.2d 594, 596 (6th Cir.1982); *United States v. Smith,* 687 F.2d 147, 153 (6th Cir.1982), *cert. denied,* 459 U.S. 1116, 103 S.Ct. 752, 74 L.Ed.2d 970 (1983).

In addition to demonstrating long-standing prosecutorial misconduct, a defendant who seeks dismissal of an indictment also must show that he was prejudiced by the prosecutor's actions. *United States v. Nembhard,* 676 F.2d at 200 & n. 4; *United States v. Smith,* 687 F.2d at 153. It has been argued that a defendant who seeks dismissal under the court's supervisory power need not show actual prejudice. *See United States v. Sears, Roebuck & Co., Inc.,* 719 F.2d 1386, 1394 (9th Cir.1983) (Norris, J., dissenting in part), *cert. denied,* —— U.S. ——, 104 S.Ct. 1441, 79 L.Ed.2d 762 (1984). The rationale for this view is that the court should strive to preserve societal values—deterrence of official misconduct and preservation of the appearance of fairness—regardless of whether the misconduct results in prejudice to the defendant. *Id.* at 1395. We considered and rejected that view in *Nembhard.* We held that prejudice must be shown before we will use a constitutional basis or our supervisory power to dismiss an indictment for prosecutorial misconduct. *Nembhard,* 676 F.2d at 200. We concluded that "the district court erred as a matter of law in using its supervisory powers to dismiss the indictment without showing prejudice to the

defendants and long-standing misconduct before grand juries in this district." *Id.* at 200 n. 4; *see United States v. Smith,* 687 F.2d at 153 (defendant must show "long-standing misconduct" and "prejudice to the defendant").

Reynolds has shown neither long-standing abuse of the grand jury nor actual prejudice. Reynolds offered no proof to the district court that prosecutors in the Eastern District of Michigan have a history of abusing the grand jury process. Reynolds offered no proof that Leibson has a history of such abuse. There is simply no evidence, or even a suggestion, of long-standing prosecutorial misconduct.

The record also fails to show that Reynolds was prejudiced by Leibson's remarks. Although the remarks surely were inflammatory, they occurred nearly eleven months before the prosecutor requested indictments. Reynolds points to no subsequent remarks that reinforced the incident in the jurors' minds. Indeed, the grand jury heard witnesses testify that Reynolds ultimately was acquitted on the obstruction charge. Further, Reynolds has never claimed that the evidence presented to the grand jury was insufficient to support the indictment. Although no inflammatory remarks were made about Griffith and McKay, they were indicted on much the same evidence that resulted in the indictment of Reynolds. Based on this record, we are unable to conclude that remarks made eleven months prior to the request for indictments resulted in an indictment that was based on bias against Reynolds rather than the overwhelming evidence amassed in an eighteen-month grand jury investigation.

To establish a fifth amendment violation based on prosecutorial misconduct before the grand jury, a defendant must show actual prejudice. In *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), the Court held that "An indictment returned by a legally constituted and unbiased grand jury ... is enough to call for trial of the charge on the mer-

its." *Id.* at 363, 76 S.Ct. at 409. Dismissal of the indictment based on the prosecutor's misconduct before the grand jury is warranted only where the misconduct "undermined the grand jury's ability to make an informed and objective evaluation of the evidence presented to it." *United States v. Sears, Roebuck & Co.*, 719 F.2d 1386, 1391 (9th Cir.1983), *cert. denied,* ── U.S. ──, 104 S.Ct. 1441, 79 L.Ed.2d 762 (1984). In other words, dismissal is inappropriate unless the misconduct resulted in prejudice to the accused. *Id.* at 1392. Actual prejudice also must be shown before an indictment will be dismissed on the basis of a violation of an accused's sixth amendment right to counsel. In *Nembhard, supra,* we noted, "The Supreme Court recently concluded that because of the strong public interest in prosecuting serious crimes, prejudice to the defendant must be shown before dismissal of an indictment would be warranted when the government has interfered with a defendant's Sixth Amendment right to counsel. *United States v. Morrison,* 449 U.S. 361, [101 S.Ct. 665, 66 L.Ed.2d 564] (1981)." *Nembhard,* 676 F.2d at 200. Although the sixth amendment violation in *Morrison* occurred after the indictment had been issued, we believe the *Morrison* rule is applicable when the alleged violation occurs during the course of the grand jury proceedings. Because Reynolds has failed to show any prejudice, dismissal of the indictment is not warranted.

■ Next, the defendants claim that they are entitled to a new trial because the petit jury used a dictionary to define the words "organization" and "organize." We agree that the jury's use of the dictionary was error; we conclude, however, that the trial judge did not abuse his discretion in denying the motion for a mistrial.

Throughout the trial the defendants argued that, although they had bought and sold large quantities of marijuana, they had not engaged in activities prohibited by 21 U.S.C. § 848. Section 848 provides a mandatory minimum sentence of ten years imprisonment for any person if:

(1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and

(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—

(A) which are undertaken by such person in concert with five or more persons *with respect to whom such person occupies a position of organizer, a supervisory position or any other position of management....*

(emphasis added). The defendants' theory at trial was that they had merely associated with one another in the course of selling marijuana; they contended that they were not "organizers" within the meaning of section 848.

The trial judge instructed the jury that An organizer can be defined as a person who puts together a number of people engaged in separate activities and arranges them in their activities in one operation or enterprise.

After the judge gave the instruction, to which none of the defendants objected, the jury retired for deliberations. The trial judge's law clerk was sworn as the bailiff. After less than two hours of deliberations, the jury requested the law clerk to provide them with a dictionary. The law clerk supplied the dictionary without the consent or knowledge of the judge or counsel. When the judge learned what had occurred, the law clerk was ordered to retrieve the dictionary. The judge then notified all counsel of the problem.

The judge sent a note to the jury room inquiring why the dictionary had been requested. The foreman sent a note to the judge indicating that the jury wished to define the word "organized." The judge then responded with a note admonishing the jury to consider no materials other than the evidence and instructions presented and to disregard anything they read in the dictionary.

After the jury completed their deliberations but before they were dismissed, the court conducted an in-chambers *voir dire*

of each juror in order to determine what use had been made of the dictionary. The court determined that a juror had looked up and read aloud the definition of "organization" and "organize." Half of the jurors indicated that they had not heard the definitions. None of the jurors indicated that he or she had been influenced by the definitions or had failed to rely on the instructions.

The jury's use of a dictionary to define a relevant legal term was error. The reason for this rule was stated in *United States v. Birges*, 723 F.2d 666 (9th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 1926, 80 L.Ed.2d 472 (1984):

> [W]e have no doubt that the sending of a dictionary into the jury room, without consulting counsel, is error. Questions or disputes as to the meaning of terms which arise during jury deliberations should be settled by the court after consultation with counsel, in supplemental instructions. Such guidance will avoid the danger that the jurors will use the dictionary to construct their own definitions of legal terms which do not accurately or fairly reflect applicable law.

*Id.* at 670–71; *see also United States v. Duncan*, 598 F.2d 839, 866 (4th Cir.), *cert. denied*, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979); *United States v. Gunter*, 546 F.2d 861, 869 (10th Cir.1976), *cert. denied*, 430 U.S. 947, 97 S.Ct. 1583, 51 L.Ed.2d 794, 431 U.S. 920, 97 S.Ct. 2189, 53 L.Ed.2d 232 (1977). *Cf. Gates v. L.G. DeWitt, Inc.*, 528 F.2d 405, 413 (5th Cir.1976) (civil case).

Although a jury's use of a dictionary is error, it is not prejudicial *per se*. *United States v. Duncan*, 598 F.2d at 866 (collecting cases). Courts have developed several different standards for determining whether jurors' use of extrinsic material requires a new trial. *See United States v. Vasquez*, 597 F.2d 192, 193 n. 1 (9th Cir.1979) (collecting cases). Some courts have suggested that a new trial is appropriate if "there is the slightest possibility that harm could have resulted," *United States v. Marx*, 485 F.2d 1179, 1184 (10th Cir.1973), *cert. de-*

*nied*, 416 U.S. 986, 94 S.Ct. 2391, 40 L.Ed.2d 764 (1974), or if "the error might have operated to the substantial injury of the defendant," *Osborne v. United States*, 351 F.2d 111, 119 (8th Cir.1965) (quoting *United States v. Grady*, 185 F.2d 273, 275 (7th Cir.1950)). Others will grant a new trial if there is "a reasonable possibility that the breach was prejudicial to the defendant." *United States v. Howard*, 506 F.2d 865, 869 (5th Cir.1975). Still others grant relief if "it can be concluded beyond a reasonable doubt that extrinsic evidence ... contribute[d] to the verdict." *Gibson v. Clanon*, 633 F.2d 851, 855 (9th Cir.1980), *cert. denied*, 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981).

This Circuit has announced a number of standards that the trial judge should use to determine whether jurors' use of extrinsic material or exposure to extraneous matter requires a new trial. *See, e.g., United States v. Norton*, 700 F.2d 1072, 1076 (6th Cir.), *cert. denied*, 461 U.S. 910, 103 S.Ct. 1885, 76 L.Ed.2d 814 (1983) (juror received threatening phone call; standard is whether outside contact "appreciably swayed" the jury); *United States v. Worthington*, 698 F.2d 820, 826 (6th Cir.1983) (juror read news article on defendant's potential sentence; standard is whether prejudice resulted); *United States v. Hill*, 688 F.2d 18, 20 (6th Cir.), *cert. denied*, 459 U.S. 1074, 103 S.Ct. 498, 74 L.Ed.2d 638 (1982) (juror read *Reader's Digest* article on the relevant law; standard is whether there was "at least some likelihood that the extrinsic materials could have affected the jury verdict"); *United States v. Van Dyke*, 605 F.2d 220, 229 (6th Cir.), *cert. denied*, 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979) (jurors read newspaper advertisement concerning defendant's employee; standard is whether prejudice resulted); *United States v. Mitchell*, 590 F.2d 816, 817 (6th Cir.1979) (juror had conversation with defendant; standard is whether error is harmless); *United States v. Serio*, 440 F.2d 827, 831 (6th Cir.), *cert. denied*, 404 U.S. 838, 92 S.Ct. 129, 30 L.Ed.2d 71 (1971) (jurors saw or read about defendant's escape attempt; standard is whether jurors remained impartial); *United States v. Ru-*

*bino,* 431 F.2d 284, 289 (6th Cir.1970), *cert. denied,* 401 U.S. 910, 91 S.Ct. 872, 27 L.Ed.2d 808 (1971) (jurors read news article critical of defendant's counsel; standard is whether prejudice resulted). Despite our various pronouncements regarding the standard to be applied by the trial judge, we have been nearly uniform in holding that on appeal the judge's decision whether to grant a mistrial because of the juror's use of or exposure to extraneous matter will be reviewed only for abuse of discretion. *See, e.g., United States v. Worthington,* 698 F.2d at 826; *United States v. Van Dyke,* 605 F.2d at 229; *United States v. Serio,* 440 F.2d at 831; *United States v. Rubino,* 431 F.2d at 289.

This Circuit has not had occasion to consider whether jurors' use of a dictionary to define a legal term—as opposed to jurors' use of or exposure to extraneous matter—requires reversal. We believe, however, that our recent case dealing with the latter situation provides guidance here. In *United States v. Pennell,* 737 F.2d 521 (6th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985), we held that a defendant who alleges prejudice from unauthorized juror communications with third persons must demonstrate that the communications resulted in "actual prejudice." *Id.* at 534. We also held, "[A] district court's decision not to grant a mistrial after investigating allegations of unauthorized contact with jurors should be reviewed only for abuse of discretion." *Id.* at 533. The method used in *Pennell* may be adopted to determine the propriety of a new trial when the jury has been exposed to a dictionary definition of a legal term. When a jury makes unauthorized use of a dictionary, the trial judge should determine whether the jury actually substituted the dictionary definition of a legal term for that given in the instructions. If any jurors substituted the dictionary definition, the court should determine whether any use of the dictionary definition resulted in prejudice to the defendant. *See United States v. Birges,* 723 F.2d at 671; *United States v. Gunter,* 546 F.2d at 869; *United States v. Boatwright,* 446 F.2d 913, 915 (5th Cir.1971). After the judge makes the required investigation, the decision whether to grant a new trial should be reviewed only for abuse of discretion. *See United States v. Duncan,* 598 F.2d at 866.

■ Applying these principles to the present case, we find that Judge Newblatt did not abuse his discretion in denying the motion for a new trial. When the judge learned that the jury had been given a dictionary, he quickly had it retrieved. After determining what use was made of the dictionary, he immediately sent a curative instruction to the jury. Judge Newblatt also conducted a *voir dire* of each member of the jury. He found that "none of the jurors gave the slightest indication that they had been influenced by the dictionary and did other than rely on the instructions." Further, even if some jurors used the dictionary definition, the defendants' claim of prejudice is undercut because, as Judge Newblatt found, "The transcript [shows] that a veritable mountain of evidence existed to support the conclusion that these Defendants fit within the statutory definition of the section 848 count." Given the immediate curative instruction, the results of the *voir dire,* and the overwhelming evidence that the defendants' activities brought them within with the proper definition of an "organizer," we cannot conclude that Judge Newblatt abused his discretion in denying the motion for a mistrial.

■ Finally, Reynolds argues that his right to remain silent was impaired when counsel for a codefendant improperly commented on Reynolds' right to testify. Griffith and McKay claim that the remark, although directed specifically at Reynolds' right to testify, interfered with the rights of every defendant who, like Reynolds, chose not to take the stand at trial.

The comment on Reynolds' silence was made by counsel for defendant Kaplan, who is not a party to this appeal. Counsel was examining a government witness who was testifying to the amount of attorney's fees he had received from Reynolds. The witness testified to receipt of a particular amount, then in an attempt to impeach the witness' credibility counsel asked:

Q. So that—now, you know that Mr. Reynolds can testify in these proceedings don't you?

A. He sure can.

This case is controlled by our recent decision in *United States v. Whitley*, 734 F.2d 1129 (6th Cir.1984). In *Whitley* we held that the defendant's right to remain silent was not impaired when the comment on his silence was made by a codefendant's counsel, not by the prosecutor. *Whitley*, 734 F.2d at 1137. "[T]he aspect of the condemned inquiry that makes it reversible error is the prosecution's emphasis on the defendant's post-arrest silence in an effort to imply a consciousness of guilt." *Id.* Reynolds does not contend, and the record does not show, that the comment on Reynolds' silence could be understood by a juror as an implication of Reynolds' consciousness of guilt. Further, Reynolds has not alleged that "the government in any manner attempted to emphasize, highlight, refer to, or utilize the testimony elicited by codefendant's counsel." *Whitley*, 734 F.2d at 1137. We conclude that the comment on Reynolds' right to testify did not impair his fifth amendment rights.

The judgment of the district court is affirmed.