# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 17, 2001 Session

## STATE OF TENNESSEE v. PAMELA SUE KING

**Direct Appeal from the Criminal Court for Davidson County**
**No. 97-D-2405     Seth Norman, Judge**

---

**No. M2000-00148-CCA-R3-CD - Filed November 9, 2001**

---

The defendant, Pamela Sue King, was indicted by a Davidson County Grand Jury on one count of first degree premeditated murder. She was subsequently convicted by a jury of second degree murder, and was sentenced by the trial court to twenty-three years incarceration at 100% as a violent offender. Following the denial of her motion for a new trial, she filed a timely appeal to this court, raising two issues: (1) whether the evidence was sufficient to support her conviction for second degree murder; and (2) whether the trial court erred in allowing the jury to use a dictionary in its deliberations. After a review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Michael A. Colavecchio (on appeal) and Lionel R. Barrett, Jr. (at trial), Nashville, Tennessee, for the appellant, Pamela Sue King.

Paul G. Summers, Attorney General and Reporter; Lucian D. Geise, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Pamela S. Anderson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

Kevin Brandon, the victim in this case, was the ex-husband of the defendant's roommate, Ruby Linette Brandon. He was also the father of Ms. Brandon's three small children, a four-year-old son and two-year-old twin daughters. Although Ms. Brandon denied the relationship, the defendant claimed that she and Ms. Brandon were on-again, off-again lesbian lovers, and that the victim

blamed her for the breakup of his marriage. As a consequence, the defendant and the victim did not get along.

A few days before his August 13, 1997, death, the victim took his four-year-old son with him on a three-day weekend trip to Seattle to attend a funeral. When they returned to Nashville on Monday, August 11, Ms. Brandon, who had recently broken both of her ankles and was confined to a wheelchair, allowed the victim to stay at the house on Cadogan Court in Antioch, Tennessee, where she and the defendant had recently moved, in order to help care for their children. According to Ms. Brandon's testimony, she and the defendant agreed in a telephone conversation that it would be best for the victim, who was not working at the time because of a strike at his place of employment, to help care for the children during Ms. Brandon's recuperation, and for the defendant to move out. In order to avoid a confrontation, the defendant stayed away for the first two days following the victim's arrival. On the third day, Wednesday, August 13, the victim agreed to leave the house long enough for the defendant to retrieve her belongings. He left the house with their son, and Ms. Brandon paged the defendant to come get her belongings.

The defendant had been at the home for approximately ten or fifteen minutes, and was in the kitchen talking to Ms. Brandon, when the victim returned and told her that he had given her enough time to get her possessions. The two began arguing. The defendant then went to the attached garage to pack her belongings, while the victim stayed inside the house to talk with Ms. Brandon.

Approximately fifteen or twenty minutes later, after Ms. Brandon had opened the house door leading to the garage to hand the defendant her driver's license, the victim and the defendant began arguing again, with the victim once again telling the defendant to leave, and the defendant telling the victim that he was going to have to give her more time. Ms. Brandon testified that the victim then became "infuriated." She said that she told him to stay in the house, and that the defendant would be finished packing in a minute. She tried to keep the victim inside the house by first holding onto the belt loop of his pants, and then his T-shirt, but he took the shirt off, went out the front door, and around to the garage.

Through the doorway leading into the garage, Ms. Brandon watched the victim take several steps into the garage, toward the driver's door of the defendant's car. She said that the victim had nothing in his hands as he approached the defendant, and was not yelling or screaming. Ms. Brandon then saw the defendant make a "gesture from behind her back," whereupon Ms. Brandon yelled the warning, "Kevin, there could be a gun involved." She next heard a popping sound, and saw the victim turn his back to the defendant. As she was frantically trying to wheel into the living room to telephone 911, the victim came in the front door, closely followed by the defendant. Ms. Brandon testified that the victim fell to the floor in the hallway, where the defendant shot him again, and then, placing the gun against his temple, shot him once more. While the defendant was shooting the victim, the children were hysterical, with the four-year-old clinging to her leg, and pleading with her, "Please don't hurt my daddy, please don't hurt my daddy." The defendant then went into the kitchen, got a knife, returned to the hallway, straddled the victim's body, and cut his neck.

A neighbor, Hayes Washington, heard a gunshot and witnessed the defendant chasing the victim into the house. He said that the victim did not have a weapon. He heard two more gunshots and "a whole bunch of screaming" after they had gone inside the house. Washington then entered the house, where he found the defendant hysterical and screaming. The victim was lying on the floor with his throat cut. A steak knife was on his neck, and a small caliber pistol was lying beside his head. Washington put the knife on a table, and removed the gun from the house, placing it on the ground beside a tree when police officers arrived at the scene.

Officers Roy Morris and Melissa Kelly, of the Metro Police Department, were the first officers to arrive at the scene. Upon Officer Morris's arrival, Washington directed his attention to the .25 caliber semi-automatic chrome pistol on the ground next to a tree, and pointed out the weeping, screaming defendant, who was lying half in and half out of the doorway of the house. Officer Morris noticed that the defendant "had blood on both hands from the upper portion of the forearm all the way down covering both hands." Officer Kelly, who arrived at the scene immediately after Officer Morris, testified that the defendant was "sobbing, and crying, and kicking her feet." After arresting the defendant and placing her in his patrol car, Officer Morris went inside the house, where he observed the victim, who appeared to be dead, lying on his back in the hallway with a "sizeable hole in his throat," and a bullet wound to the back of his head.

Detective Jeff West, of the Metro Police Department Homicide Unit, testified that he observed three gunshot wounds to the victim: one to the back of his head, one to the chest, and one to the right arm. He also observed laceration wounds to the neck area and what appeared to be stab wounds to the victim's face. Detective West said that the steak knife and the pistol were the only weapons discovered at the scene. Officer Earl Hunter, a crime scene investigator with the Identification Unit of the Metro Police Department, testified that there were no live rounds in either the chamber or the magazine of the gun when it was collected at the scene. Officer Charles Ray Blackwood, Jr., testified that a trail of blood led from the garage, around to the sidewalk, up the front steps, and to the front door of the house.

Dr. Emily Ward, the medical examiner who performed the autopsy of the victim's body, testified that the manner of death was homicide, and that the cause of death was multiple gunshot wounds. Her examination revealed that the victim suffered three gunshot wounds and several incised wounds, or cuts. There was a gunshot wound to the head in which the bullet entered the right side of the head, passed through the right side of the brain, and lodged in the base of the skull; a gunshot wound to the chest in which the bullet passed through the left ventricle of the heart, continued through the left lung, passed through the left ninth rib on the back of the chest, and lodged in the skin; and a gunshot wound to the right arm in which the bullet entered the back of the right arm, exited the front of the right forearm, and then reentered the arm above the elbow. Dr. Ward testified that the head wound was a contact wound, meaning that the gun had been firmly pressed into the victim's head when it was fired. The wound to the heart and lungs, she said, would have caused a very rapid drop in blood pressure and, "within a relatively short period of time," compromised the victim's ability to breathe and move. The victim had four separate small cuts in a semicircle around his left eye, and a group of cuts with a dimension of about three to four inches

on the front of his neck. Dr. Ward was unable to determine if the cuts on the victim's neck were caused by one continuous movement of the knife, or by multiple cuts. She found no defensive wounds on the victim's body.

The State's final witness was Sergeant Johnny L. Hunter of the Identification Division of the Metro Police Department. After being accepted by the court as an expert in the field of blood spatter analysis, he testified that the blood on the garage floor, on the steps leading out of the house into the garage, and in front of the house on the pavement, was low velocity blood spatter, consistent with free-flowing blood dropping from a wound. Inside the house, he found expectorant blood spatter (*i.e.*, blood consistent with that expelled by a victim's coughing or sneezing) beside the victim's head, and cast-off blood spatter, in the form of bloody handprints, on the wall beside the victim's body.

The thirty-two-year-old defendant testified on her own behalf. She said that she brought several items to return to Ms. Brandon when she arrived at the home, including the gun that Ms. Brandon had earlier left under the defendant's car seat, and which the defendant had in her pocket as she entered the home. She first greeted Ms. Brandon and her daughters, and then went out to the garage to pack her belongings and load them into her car. Later, she heard Ms. Brandon crying and went to the kitchen to ask her what was wrong. As Ms. Brandon told her that she loved her and did not want her to leave, the victim entered the kitchen and began screaming obscenities at the defendant, calling her a "dyke" and a "white bitch," and telling her that he was going to kill her. The defendant said that she begged the victim to allow her to leave, and then ran out into the garage. The victim continued screaming that he was going to kill her, and then ran through the house and into the garage. He ran toward her, reaching behind his back as he did so, and laughing and telling her again that he was going to kill her. At that point, she reached into her pocket and fired her gun at him.

The defendant said that she had no intention of killing the victim when she went to the home, and that she fired at him only because she feared for her life. After firing the first shot, the victim was still standing, and continued coming toward her. He then turned to go out of the garage, and so did she. The next thing she remembered was being in the house. She said that she was hysterical, afraid for her life, and did not know what to do. She remembered the victim standing in the house and screaming, and remembered herself screaming. She fired a shot, and the victim was still screaming. She said that she remembered "clicking the gun 'til there was–just kept clicking, and clicking." She also remembered having the knife in her hand, that the victim was still moving, and that she was afraid he would kill her. She could not remember having cut the victim with the knife, but did not deny that the cuts had been made by her.

The defendant described several earlier confrontations in which, she said, the victim had physically attacked and assaulted her. She testified that the victim had threatened her a number of times in the past, and made harassing and threatening phone calls. According to the defendant, she and Ms. Brandon periodically separated during the years that they lived together, because the victim would start calling or riding by their house, or making threats toward her. She said that Ms. Brandon

told her that she feared what the victim would do to her. The defendant also claimed that the reason she and Ms. Brandon had chosen the house on Cadogan Court was because it had an attached garage, so that the victim would not be able to drive by and see her car parked at the house.

On cross-examination, the defendant admitted that she had not seen anything in the victim's hand when he ran toward her in the garage. She repeated, however, that he had laughed and reached behind his back as he ran toward her. She said that he told her he had something for her, and that she heard Ms. Brandon yell out something about a gun. She denied having heard Ms. Brandon direct her warning to the victim, rather than to herself, and claimed that she did not remember having told the police, in the statement she gave immediately after the shooting, that she had heard Ms. Brandon call out "Kevin, look out, there's a gun in the house, there's a gun in the house." She also did not remember having told the police that the victim was inside the house for a while, after being shot in the garage, while she was still outside the house.

The State then played the videotape of the defendant's statement to police before the jury. The tape reveals that the defendant admitted during the interview that she heard Ms. Brandon call out "Kevin, there's a gun in the house." The tape also reveals, however, that the defendant told the police that she thought that perhaps Ms. Brandon was trying to warn her. During one point in the interview, the defendant told the police that the victim answered the warning by saying, "I'm not worried about that white bitch, I've got a gun of my own." Later during the interview, she said that the victim had said, presumably to her, "That's all right bitch, I've got a gun of my own." The defendant also said, when questioned about the sequence of events, that she thought that the victim was in the house for a while, after first being shot, before she went into the house. The videotape was admitted into evidence.

## SUFFICIENCY OF EVIDENCE

The defendant first challenges the sufficiency of the evidence in support of her conviction, contending that she should have been convicted of voluntary manslaughter, rather than second degree murder. When the sufficiency of the evidence is contested on appeal, the relevant question for the reviewing court is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Tenn. R. App. P. 13 (e); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). The State is entitled to the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). In conducting our evaluation of the convicting evidence, this court is precluded from reweighing or reconsidering the evidence. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Furthermore, a verdict of guilty by the jury, approved by the trial judge, accredits the testimony of the State's witnesses and resolves all conflicts in testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994). Although an accused is originally cloaked with a presumption of innocence, a jury verdict removes this presumption and replaces it with one of guilt.

State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the appellant to demonstrate the insufficiency of the convicting evidence. Id.

Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a) (1997). "'Knowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly . . . when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (1997). Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a) (1997).

The defendant argues that the proof in the case demonstrated that she acted in self-defense, under a reasonable and well-founded fear of imminent bodily harm, when she first shot the victim, and that the jury should have found that her continued pursuit occurred in a state of passion provoked by adequate provocation that would have led a reasonable person to act in an irrational manner. In support of her argument, she points to her testimony regarding the victim's previous assaults and threats against her, as well as her testimony that the victim threatened to kill her, reaching behind his back and saying he had something for her as he ran toward her in the garage.

The defendant's account of the incident, however, differed from that of witnesses offered by the State. Ms. Brandon testified that the victim had nothing in his hands as he approached the defendant, that she did not hear him scream or shout at the defendant, and that it was the defendant, rather than the victim, whom she saw make a "gesture" behind her back. In Ms. Brandon's version of the events that transpired after the victim fled into the house, the victim was not standing and screaming, as the defendant claimed, but instead was lying on the floor of the hallway when the defendant shot him once, shot him again by pressing and firing the gun into his temple, and then straddled his body to cut his face and neck. She said that she never saw the victim fight back, with either his hands or an object, when he ran into the house. Ms. Brandon also contradicted the defendant's versions of prior confrontations with the victim, acknowledging that the defendant and the victim had "bicker[ed]" in the past, but denying that the victim had ever physically fought with the defendant. She further denied that the defendant ever attempted to hide her car from the victim's view, or that she and the defendant chose the house on Cadogan Court because of its enclosed garage. The neighbor who witnessed the defendant chasing the victim in the house also testified that the victim was unarmed. The police who investigated the scene did not find any weapon, other than the gun and knife used by the defendant.

Whether or not a defendant acted in self-defense is a question of fact for the jury to determine. See State v. Renner, 912 S.W.2d 701, 704 (Tenn. 1995); State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). Similarly, whether or not a defendant's actions occurred in a state of passion provoked by sufficient provocation, such as to make the offense voluntary manslaughter, is also a question of fact for the jury to determine upon a consideration of all the evidence. State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). The jury in this case

obviously chose to reconcile conflicts in the testimony in the State's favor, and to reject the defendant's claim of self-defense, as well as the lesser offense of voluntary manslaughter. This was its prerogative. The evidence was sufficient to support the defendant's conviction for second degree murder.


## EXTRANEOUS INFORMATION

The defendant next contends that the trial court committed prejudicial error in allowing the jury to take a dictionary to the deliberation room. The record shows that after beginning its deliberations in the case, the jury returned to the courtroom, where the following exchange occurred:

> THE COURT: Good morning, Ladies and Gentlemen. I understand that y'all want to view the tape that was introduced in this matter and I want to give you an explanation.
>
> . . . .
>
> All right, now, the other thing is you have asked me for an explanation or a definition with regard to a certain portion of the charge.
>
> I can't give explanations. I can send a dictionary upstairs with you but that's all I can do. I cannot define one part of the charge as compared to another part. That is the Jury's job.
>
> And again, that's what I'll do. If you want a dictionary I'll give you one. Okay, we can do that.

The defendant argues that the dictionary, which was not introduced into evidence at trial, constituted prejudicial extraneous information, and that the burden thereby shifts to the State to prove that its use was harmless. The State responds by arguing that the defendant waived the issue by her failure to include it in her motion for a new trial. The State further argues that the record does not establish that the trial court actually allowed the jury to refer to a dictionary during its deliberations.

When faced with questions from the jury regarding the definition of legal terms, it is appropriate for the trial court, after consultation with counsel, to provide the jury with supplemental instructions. See United States v. Griffith, 756 F.2d 1244, 1251 (6th Cir. 1985) ("'Questions or disputes as to the meaning of terms which arise during jury deliberations should be settled by the court after consultation with counsel, in supplemental instructions.'") (quoting United States v. Birges, 723 F.2d 666, 670-71 (9th Cir.), cert. denied, 466 U.S. 943, 104 S. Ct. 1926, 80 L. Ed. 2d 472 (1984)); see also State v. Allen Bowers, Jr., No. E1999-00882-CCA-R3-CD, 2001 WL 991969 at *13 (Tenn. Crim. App. Aug. 30, 2001) ("It is well settled that a trial court may provide supplemental instructions in response to jury questions.") (citing State v. Forbes, 918 S.W.2d 431, 451 (Tenn. Crim. App. 1995)). A trial court should not, however, allow a jury to use a dictionary in its deliberations. The danger in such a situation is that jurors will use the dictionary to "'construct their own definitions of legal terms which do not accurately or fairly reflect applicable law.'" Griffith, 756 F.2d at 1251 (quoting Birges, 723 F.2d at 670-71).

The trial court in this case should not, therefore, have allowed the jury unfettered access to a dictionary. There is no indication in the record, however, that defense counsel raised any objection at trial to the court's suggestion that it could supply the jury with a dictionary. The defendant also failed to raise the jury's alleged use of the dictionary as an issue in his motion for a new trial. (R, 36) We therefore agree with the State that the issue has been waived on appeal. See Tenn. R. App. P. 36(a).

Moreover, the defendant has failed to meet her burden of proving that the jury considered extraneous prejudicial information in its deliberations. Extraneous information is information that comes from a source outside the jury, and includes (1) exposure to news reports about the trial; (2) consideration of facts not in evidence; and (3) communications with a third party nonjuror about the case. Caldararo v. Vanderbilt Univ., 794 S.W.2d 738, 742 (Tenn. Ct. App. 1990) (citing State v. Coker, 746 S.W.2d 167, 171 (Tenn. 1987)). The defendant first bears the burden of showing that the jurors were exposed to extraneous prejudicial information. See State v. Parchman, 973 S.W.2d 607, 612 (Tenn. Crim. App. 1997); see also State v. Orlando Crenshaw, No. M2000-01459-CCA-R3-CD, 2001 WL 589171, at *18 (Tenn. Crim. App. June 1, 2001) ("The defendant bears the burden of showing that the jurors were exposed to extraneous information[.]") (citing State v. Blackwell, 664 S.W.2d 686, 689 (Tenn. 1984)). Upon proof that extraneous information was imparted to the jury, the threshold question is whether the extraneous information was prejudicial to the defendant. See Parchman, 973 S.W.2d at 612. When proof has been presented that the jury was exposed to extraneous prejudicial information, a rebuttable presumption of prejudice arises, and the burden then shifts to the State to explain the conduct or demonstrate that the extraneous prejudicial information was harmless. State v. Young, 866 S.W.2d 194, 196 (Tenn. Crim. App. 1992).

The only reference to the jury's use of the dictionary in the record is contained in the trial court's statement quoted above, in which it concluded, "If you want a dictionary, I'll give you one. Okay, we can do that." The record does not reveal which term or terms the jury asked to have defined. No evidence was presented to show that the jury was actually given a dictionary. Even if

it was, there was no evidence that the jurors relied on it during deliberations, or that it influenced their verdict.   This issue, therefore, is without merit.

Accordingly, the judgment of the trial court is AFFIRMED.

                    _____
                    JERRY L. SMITH, JUDGE