UNITED STATES of America, Appellee,

v.

Barry GARFINKEL, Appellant.

UNITED STATES of America, Appellant,

v.

Barry GARFINKEL, Appellee.

Nos. 93–3873, 93–4001.

United States Court of Appeals,
Eighth Circuit.

Submitted March 18, 1994.

Decided July 13, 1994.

Lawrence S. Robbins, Washington, DC, argued (Laurie R. Rubenstein, DC, Douglas Kelley and Steven Wolter, Minneapolis, MN, on the brief), for appellant.

Andrew Mark Luger, Asst. U.S. Atty., Minneapolis, MN, argued, for appellee.

Before MAGILL, Circuit Judge, HEANEY, Senior Circuit Judge, and HANSEN, Circuit Judge.

MAGILL, Circuit Judge.

Barry Garfinkel appeals from the district court's [1] judgment entered after a jury found him guilty of making false statements to the government in violation of 18 U.S.C. § 1001 (1988) and mail fraud in violation of 18 U.S.C. § 1341 (Supp. IV 1992) and § 1346 (1988). The government cross-appeals the district court's denial of a sentencing enhancement. We affirm.

## I. BACKGROUND

Garfinkel, a psychiatrist and director of child and adolescent psychiatry at the University of Minnesota, was engaged by CIBA–GEIGY [2] in 1986 to participate in a research study involving the investigational drug, Anafranil. Such research studies are required by the Food and Drug Administration (FDA) pursuant to authority granted by the Food, Drug, and Cosmetic Act. Prior to approval of a drug for mass marketing, a pharmaceutical company is required to submit its plan, or protocol, for investigating the safety and effectiveness of the drug to FDA for approval. Research investigators then compile, through procedures mandated by the protocol, the data that will be used by FDA to determine whether the drug is safe and effective.

Between 1986 and 1989, Garfinkel participated, as the principal investigator,[3] in several research studies involving Anafranil. CIBA–GEIGY had proposed to FDA to study Anafranil because it believed Anafranil had potential therapeutic effects for individuals suffering from obsessive-compulsive disorder (OCD).[4]

At the University of Minnesota site, Garfinkel enrolled in the study of children and adolescents suffering from OCD. Protocol 64, the initial study in which Garfinkel participated, was a ten-week double-blind study.[5]

---

1. The Honorable David S. Doty, United States District Judge for the District of Minnesota.

2. CIBA–GEIGY is a pharmaceutical company.

3. Garfinkel was the principal investigator at the University of Minnesota site. There were five other research sites.

4. Anafranil, which has the generic name of clomipramine, is a tricyclic antidepressant. CIBA–GEIGY originally planned to market the drug as an antidepressant but did not due to significant concerns about its safety profile. Although there were safer drugs approved for use as antidepressants, there were no other drugs approved for the treatment of OCD. CIBA–GEIGY was particularly concerned about a higher reported incidence of seizures related to Anafranil use.

5. In a double-blind study, some patients receive Anafranil and others receive a placebo; neither the investigator nor the patient have knowledge of which drug the patient is receiving.

Data intended to indicate the safety and effectiveness of the drug were then collected through weekly patient visits. The data included, among other data, the completion of psychiatric rating scales and physical exams. After the initial ten-week period, Protocol 64 was extended to a one-year open-label study [6] to investigate further Anafranil therapy in patients who were enrolled in Protocol 64. After the completion of Protocol 64, CIBA–GEIGY then enlarged the scope of its investigation of Anafranil by conducting a larger open-label study entitled Protocol 62.

Prior to beginning the study of Anafranil, CIBA–GEIGY held an investigator's meeting in Toronto. During that meeting, the investigators received pharmaceutical information regarding Anafranil, instruction on the study protocol and required methodology, and training in the specific psychiatric review techniques required by the protocol. In Toronto, as part of the pre-study training, the investigators received specific instruction regarding the completion of the patient record forms (PRFs) that each patient enrolled in the study was assigned. PRFs are multi-page booklets intended for patient data collection and constructed by CIBA–GEIGY so that the investigator is aware from the PRF specifically what data must be collected for each patient visit.[7]

In February 1989, Michelle Rennie, the study coordinator at the University of Minnesota site, filed a complaint with the University of Minnesota against Garfinkel. This complaint led to investigations by CIBA–GEIGY and FDA and, eventually, to Garfinkel's indictment. Rennie complained that Garfinkel ordered her to conduct entire study visits, including the accumulation of psychiatric and medical data; ordered her to enter false data on PRFs for visits that never occurred or for patients that did not fit the

protocol requirements; and prescribed prohibited medications for patients during the study and ordered her to conceal their use. Rennie, although college educated, has no health care background.

In February 1993, a grand jury returned a twenty-five-count indictment against Garfinkel. After a jury trial, Garfinkel was convicted of three of the false statements counts and two of the mail fraud counts. Garfinkel timely appealed.

## II. GARFINKEL'S APPEAL

Garfinkel argues on appeal that his conviction should be reversed because his signature on the PRFs was not a false statement in violation on 18 U.S.C. § 1001, nor, according to Garfinkel, was his signature on the PRFs in furtherance of a scheme to defraud in violation of 18 U.S.C. § 1341 and § 1346. Garfinkel alleges further defects in both the mail fraud counts and evidentiary error.

### A. The False Statements Counts

At Garfinkel's trial, he was tried on nineteen counts of violating the False Statements Act. The False Statements Act prohibits the intentional making of a false statement in a matter within the jurisdiction of the government.[8] The jury found Garfinkel guilty of counts five, twenty-one, and twenty-three.

Count five charged Garfinkel with falsely representing, through his signatures on the relevant PRF pages, that he had personally conducted Eve G.'s initial visit in Protocol 62. Count twenty-one charged Garfinkel with representing, through his signatures on the relevant PRF pages, that he had conducted Tom B.'s visit 17 in Protocol 64. And, count twenty-three charged Garfinkel with repre-

6. During an open-label study, the investigator and the patient know what drug is being administered.

7. For example, the PRF booklets were divided by patient visit. Patient visit one required the collection of different data than patient visit ten.

8. 18 U.S.C. § 1001 states:
 **§ 1001. Statements or entries generally**
 Whoever, in any matter within the jurisdiction of any department or agency of the United

States, knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

senting, through his signatures on the relevant PRF pages, that he had conducted Stephanie M.'s visit 21 in Protocol 64. The evidence indicated that Garfinkel performed none of these visits, and that, in fact, no clinical investigator conducted the visits. Eve G. testified that Garfinkel did not conduct, nor did any individual conduct, her first visit in Protocol 62. The evidence indicated that Tom B. and Stephanie M. were seen by Rennie.

Garfinkel argues that his signature on the PRF did not constitute a false statement. Relying on *Williams v. United States,* 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), Garfinkel contends that his signature on the PRF simply is not a statement, false or otherwise. We do not review this claim. Because Garfinkel's trial defense and this argument are mutually exclusive, "he cannot now be heard to complain about his strategic choices." [9] *United States v. Auman,* 920 F.2d 495, 497 n. 5 (8th Cir.1990). In the alternative, Garfinkel alleges that his signature on the PRF is an ambiguous statement and the government " 'failed to clarify the

facial ambiguities' in the underlying statement." Appellant's Br. at 25 (quoting *United States v. Anderson,* 579 F.2d 455, 460 (8th Cir.), *cert. denied,* 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978)). The government counters that its reliance at trial was not simply on the signature but on testimony about what Garfinkel was told the signature meant.

Garfinkel's defense at trial was quite specific: He alleged his signature at the bottom of each PRF page certified that he had reviewed the data, *i.e.,* assessed the data on the form, irrespective of who performed the actual evaluation, or assessment, of the patient.[10] The government claimed that Garfinkel's signature on the PRF certified that he had personally performed the patient visit.[11] We agree that, standing alone, the statement related by Garfinkel's signature on the PRF is ambiguous; however, we also agree with the government that evidence offered at trial could potentially resolve any ambiguity on the face of the document. *See Anderson,* 579 F.2d at 459–60; *United States v. Lanier,* 578 F.2d 1246, 1252 (8th Cir.), *cert. denied,* 439

---

9. Even if we were to review this claim, Garfinkel's failure to object at trial on this basis would require that we review for plain error. Garfinkel would be unable to surmount this barrier because the error must be clear under current law. *United States v. Olano,* — U.S. —, —, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993). We note that in *Williams,* the government charged the defendant under 18 U.S.C. § 1014, not § 1001, with " 'knowingly and wilfully mak[ing] a false statement of a material fact,' " 458 U.S. at 283, 102 S.Ct. at 3090 (citation omitted), the passing of a "bad check." *Id.* The Court held that "a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.' " *Id.* at 284, 102 S.Ct. at 3091. This holding was based on two premises: Both of which demonstrate that *Williams* does not control. First, the holding relied on Congress's intent when it enacted § 1014. *Id.* at 287, 102 S.Ct. at 3093. Second, the holding relied upon the "common understanding" or implied representation made by the act of depositing a "bad check." *Id.* at 286 & n. 7, 287 n. 9, 102 S.Ct. at 3093 & n. 7, 3092 n. 9. The government, in the instant case, did not rely upon an *implied representation;* instead, it relied upon what Garfinkel knew, or was told, his signature represented.

10. Garfinkel's defense was presented to the jury in Instruction No. 23, offered without objection.

 Barry Garfinkel further contends that he is not guilty of making false statements because

when he signed a PRF he was not certifying that he conducted the visit himself *but rather* that the clinical data documented on the page had been done, that he had exercised his professional judgment about it, and that as the responsible physician for the study he was taking professional responsibility for it.

Jury Instruction 23 (emphasis added).

11. The government alleged in the indictment that Garfinkel

in a matter within the jurisdiction of the Food and Drug Administration of the United States Department of Health and Human Services, did knowingly and wilfully make and use a false writing and document knowing that the same contained false, fictitious and fraudulent statements and entries in that *the defendant signed the PRF forms ... representing that he had conducted study visits with these patients when, in fact, as he well knew, he had not conducted the visits contained in the PRF forms nor had any physician or authorized investigator.*

Indictment ¶ 50 (emphasis added). The relevant jury instruction charged Garfinkel with making a false statement because "the defendant signed [the PRFs], thereby representing that he had conducted the study visits indicated on those documents, when he did not actually do so." Jury Instruction No. 32.

U.S. 856, 99 S.Ct. 169, 58 L.Ed.2d 163 (1978).[12]

"[T]he government ha[s] the burden of negativing any reasonable interpretation that would make the statements true." *United States v. Adler*, 623 F.2d 1287, 1289 (8th Cir.1980). The parties explicitly limited the jury's interpretations of the representation made by the PRF signature. The jury was faced squarely with the question whether Garfinkel's signature on the PRF pages represents a statement that Garfinkel had personally conducted the patient visit or if the signature represents a statement that Garfinkel examined and analyzed the data. As a result, despite Garfinkel's characterization of his arguments on appeal, we believe he has raised a challenge to the sufficiency of the evidence supporting his conviction. That is, Garfinkel alleges that the evidence does not support the jury's verdict adopting the government's characterization of the PRF representation, as opposed to his characterization.

■ When reviewing the sufficiency of the evidence, or "the denial of a motion for judgment of acquittal, we examine the evidence in the light most favorable to the government."[13] *United States v. Patterson*, 886 F.2d 217, 218 (8th Cir.1989). "[T]he government is given the benefit of any reasonable inferences drawn from the evidence." *Id.* We reverse a jury verdict only if "the evidence viewed in the light most favorable to the [g]overnment is such that a reasonably minded jury *must* have reasonable doubt." *Id.* (internal quotations and citation omitted).

In support of their opposing views of the statement intended by the PRF signature line, the parties offered written materials that were given to the clinical investigators by CIBA–GEIGY. They also offered the testimony of witnesses regarding instructions given to Garfinkel for completing the PRFs

and the understanding of other investigators or officials connected to the study.

The clinical investigators were given two different written instructions regarding the PRF signature line. The CIBA–GEIGY Clinical Investigator Reference Manual (the Manual) stated:

> Regarding PRF entries, assistant investigators *may* sign their names to that work performed by them during the course of the clinical investigation. With regard to the verification of PRF entries made by associates, there *must* be a verification by the investigator as to the accuracy of the information; e.g. a comparison to source documents. This is not intended to mean that every entry must be checked by the investigator, *nor does it mean that every page must be signed by the investigator.* The investigator should, however, assure himself/herself through a review of that information, that the associate is completing the PRF's accurately. Additionally the investigator should sign off on the overall document.

Appellant's App. at 93A (emphasis added). Thus, according to the Manual, Garfinkel was permitted to sign off on the PRFs resulting from examinations conducted by other clinical, but assistant, investigators. In counts five, twenty-one, and twenty-three, the evidence indicated that no other clinical investigator had seen the patients. Unlike the scenario permitted by the Manual, Garfinkel was not convicted for signing PRFs for which an assistant investigator had done the patient visit. The jury could have inferred that if Garfinkel's signature was the lone signature on a PRF for which no clinical investigator had conducted the visit, that he was representing that he had made the patient visit. Examining this evidence in the light most favorable to the government, we find the Manual to be supportive of the government's position.

*accord United States v. Mayberry,* 913 F.2d 719, 722 (9th Cir.1990).

12. Garfinkel alleges that any false statement, as that term is defined under § 1001, must appear on the face of the document. In short, Garfinkel attempts to limit the False Statements Act to those statements that contain a certification. We disagree. *See Lanier,* 578 F.2d at 1252 (meaning of daily deposit entries clarified through evidence that defendant had been informed that the figures listed were to reflect the deposits made);

13. Garfinkel made a posttrial motion for a judgment of acquittal that challenged the sufficiency of the evidence supporting his convictions on counts five, twenty-one, and twenty-three.

Both parties assert that a statement in the Directions for Completion of CIBA–GEIGY Patient Record Forms supports their position at trial. It states, "[w]here indicated, the signature for each visit's record form *must* be that of the responsible physician *making the assessment for that particular visit.*" Appellant's App. at 51A (emphases added). Garfinkel interprets the language to read: the signature for each visit's record form must be that of the responsible physician making the *data* assessment for that particular visit.[14] In contrast, the government interprets the language to read: the signature for each visit's record form must be that of the responsible physician making the *patient* assessment for that particular visit.[15] Without additional evidence to clarify its two polar meanings, this statement is ambiguous.

In addition to the documentary evidence, testimony was offered to the jury regarding the meaning of the PRF signature line and the responsibilities of the investigators. CIBA–GEIGY officials testified that investigators were instructed that they were to conduct personally all patient visits, that the signature line on the PRF was for the physician conducting the visit, and that Garfinkel received explicit instructions regarding how to complete the PRFs. Rennie testified that CIBA–GEIGY officials instructed the investigators at the Toronto conference that the psychiatrist who saw the patient was to sign the PRF.[16] Garfinkel's assistant, Jonathan Jensen, testified on cross-examination that CIBA–GEIGY informed him it was paying for physician time and wanted the psychiatrist to do the OCD psychiatric rating scales contained in the PRFs.

Examining the evidence in the light most favorable to the government, we cannot say a reasonably minded jury *must* have had a reasonable doubt regarding the meaning of Garfinkel's signature on the PRFs in counts five, twenty-one, and twenty-three.[17] The evidence proffered at trial supported the jury's interpretation of the statement made by Garfinkel's signature on the PRFs. Therefore, we affirm the district court's entry of judgment convicting Garfinkel of violating the False Statements Act.

## B. Mail Fraud

 A conviction under the mail fraud statute, 18 U.S.C. § 1341,[18] requires (1) proof of participation in a scheme to defraud and (2) use of the mail for the purpose of executing or attempting to execute the scheme. *Pritchard v. United States,* 386 F.2d 760, 764 (8th Cir.1967), *cert. denied,* 390 U.S. 1004, 88 S.Ct. 1247, 20 L.Ed.2d 104 (1968). Garfinkel, charged with four counts of mail fraud, was found guilty by the jury on two of those counts. He now challenges those convictions,[19] contending that in count two the jury

---

14. Garfinkel argues the instruction mandates that the signatory assess or evaluate the data accumulated as a result of the patient visit.

15. The government interprets this language to require the signatory to assess or evaluate the patient by performing the necessary physical examinations or psychiatric rating scales.

16. On cross-examination, Rennie also testified that Garfinkel left during a portion of the PRF instructions.

17. We note that the jury was also instructed that [t]he defendant cannot be found to have knowingly made or used a false document, if under any reasonable interpretation, the alleged false statements contained in the document, could be truthful. In establishing its burden of proving beyond a reasonable doubt that by signing the patient report forms at issue in Counts 5 through 23 of the indictment, the defendant rendered these documents false, the government must negate any reasonable interpreta-

tion of the defendant's act of signing those documents that would make the statements contained therein truthful.
Jury Instruction No. 33.

18. 18 U.S.C. § 1341 provides in pertinent part:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, [uses or causes the mail to be used], shall be fined not more than....

19. Garfinkel also argues that because the PRF signatures were not false representations, they could not form a representation underlying the mail fraud counts. However, our disposition in II.A. of Garfinkel's false statements claim compels us to reject this argument. Similarly, Garfinkel argues that the entire PRF signature issue prejudicially tainted his trial; again, our disposition of this issue in II.A. disposes of this claim.

was allowed to consider a legally invalid basis for conviction and that in count three his conviction was based on a mailing that was not in furtherance of the fraud.

### 1. Count Two

■ In *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court limited the application of § 1341. The Court interpreted § 1341 to prohibit the use of the mail to further schemes depriving one only of money or property. *Id.* at 358–59, 107 S.Ct. at 2881. Thus, in *McNally*, the government's charge that McNally had deprived persons of an intangible right did not state a criminal violation under § 1341. However, on November 18, 1988, 18 U.S.C. § 1346 was signed into law, stating that "the term 'scheme or artifice to defraud' includes a scheme to deprive another of the intangible right to honest services." 18 U.S.C. § 1346.

Count two charged that "[b]eginning in approximately September of 1986 and continuing through 1989," Indictment ¶ 36, Garfinkel "devised a scheme and artifice to defraud CIBA–GEIGY, the FDA and the University of Minnesota of the right to his honest services and to obtain money and property from CIBA–GEIGY." *Id.* Garfinkel was thus charged under both § 1341 and § 1346 of causing deprivations of money, property and the intangible right to his honest services. Garfinkel argues that his conviction for count two violates the Ex Post Facto clause of the Constitution because the letter underlying the count-two conviction was mailed on November 18, 1988, the date § 1346 was signed into law.

Garfinkel's Ex Post Facto clause challenge to his conviction assumes that mail fraud comes to fruition on the date of the mailing. Appellant's Br. at 43. This is not necessarily so. *See, e.g., United States v. Cady*, 567 F.2d 771, 775 (8th Cir.1977) (mailing must be employed *before* the scheme reaches fruition), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978). When Garfinkel moved pretrial to dismiss this count, the district court found the following:

> Defendant contends that the scheme he is charged with came to fruition prior to the enactment of this section. This Court disagrees. As the principal investigator of protocol 62, defendant received Anafranil well into 1989 and signed PRFs as late as July, 1989. During that time he continued to represent that he had complied with the protocols or had permission to depart from the protocols. This behavior, if proven, served to coverup his scheme.

Appellant's App. at 118A. We agree with the district court's reasoning. Although "causing the use of the mail for the purpose of executing the fraud" is a necessary element of mail fraud, *Pritchard*, 386 F.2d at 764, nothing in the statute or the government's indictment of Garfinkel implied that the mailing underlying count two brought the scheme to fruition. Directly to the contrary, the indictment charged Garfinkel with devising the scheme "[b]eginning in approximately September of 1986 and continuing through 1989." Indictment ¶ 36. The evidence offered at trial supported the government's contention in its indictment that the scheme was ongoing through 1989, as Garfinkel continued to participate in the Anafranil study, sign PRFs, and falsely represent that he had complied with the protocol.

■ "[I]n the case of continuing offenses … the Ex Post Facto clause is not violated by application of a statute to an enterprise that began prior to, but continued after, the effective date of [the statute]." [20] *United States v. Torres*, 901 F.2d 205, 226 (2d Cir.), *cert. denied*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990); *see also United States v. Reetz*, 18 F.3d 595, 598 (8th Cir.1994) (application of the version of the Sentencing Guidelines enacted during a continuing offense does not violate the Ex Post Facto clause); *United States v. Hammen*, 977 F.2d 379, 385 (7th Cir.1992) (Gibson, F.) (application of § 1346 to a bank fraud scheme that spanned

---

**20.** Had the scheme been completed or come to fruition prior to the enactment of § 1346, we would agree that this would violate the Ex Post Facto clause. *See United States v. Shyres*, 898 F.2d 647, 651 n. 3 (8th Cir.) (section 1346 does not apply to a mail fraud scheme that came to fruition prior to November 1988), *cert. denied*, 498 U.S. 821, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990).

the effective date of the statute is permissible because the scheme was still "alive"); *United States v. Alkins,* 925 F.2d 541, 549 (2d Cir.1991) (focus should be on the defendant's conduct subsequent to the effective date of § 1346). The evidence at trial supported the government's allegations that the scheme continued through 1989, well past the effective date of the statute. Thus, application of § 1346 to Garfinkel's conviction on count two did not violate the Ex Post Facto clause.

### 2. Count Three

■ Garfinkel argues that count three should have been dismissed because the mailing underlying that count of the indictment was not a mailing in furtherance of the alleged scheme to defraud. The mailing at issue is a letter written by Garfinkel and sent to CIBA–GEIGY on March 29, 1989. Garfinkel wrote the letter in response to Rennie's allegations of protocol misconduct. In the letter, Garfinkel informed CIBA–GEIGY of the allegations and admitted to prescribing concomitant medications in violation of the protocol. Garfinkel maintained in the letter that one of the prohibited medications prescribed by him for a protocol patient had been approved by a CIBA–GEIGY official when, in fact, the evidence indicated it had not. The letter was used by the government as a confession and, in general, as evidence against Garfinkel.

The government argues that the letter, and in particular the statement indicating approval for the concomitant medication, was written to conceal Garfinkel's fraudulent conduct. Garfinkel counters that the letter did nothing to perpetuate the fraud and thus cannot be an underlying mailing for § 1341 purposes.

"The relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether the mailing later, through hindsight, may prove to have been counterproductive and return to haunt the perpetrator of the fraud." *Schmuck v. United States,* 489 U.S. 705, 715, 109 S.Ct. 1443, 1450, 103 L.Ed.2d 734 (1989). A reasonable jury could have found that the letter was written to facilitate Garfinkel's continuing participation in the study, thus aiding in the execution of the scheme to defraud. Hence, we hold a reasonably minded jury could find that the letter underlying count three was in furtherance of the scheme to defraud.

### C. The Defense Exhibit

■ The district court refused to admit Defense Exhibit 243–4. The exhibit was intended to undermine the government's PRF signature evidence. According to Garfinkel, Defense Exhibit 243–4 would have shown that CIBA–GEIGY does not *always* insist that the principal investigator conduct the underlying visit before signing off on the PRFs. The exhibit was comprised of a CIBA–GEIGY memorandum and accompanying letter from a Wisconsin physician, Dr. Barklage. In the letter, Dr. Barklage informed CIBA–GEIGY that she had not yet signed off on, but took responsibility for, all the PRFs signed by psychiatric residents under her direction. She was informed by CIBA–GEIGY that this should *not* be a routine practice and in the future she should sign all PRFs completed by residents under her direction. The district court refused to admit this exhibit, finding that to do so would have allowed a mini-trial on the Wisconsin procedures.

We review the district court's ruling on the admission of evidence for an abuse of discretion. We agree with the district court that Defense Exhibit 243–4 was at best confusing, and at worse irrelevant, to the jury's determination of the issues. The disputed issue concerned whether the PRF signature represented that the psychiatrist had performed the underlying patient visit *or* whether the signature represented that the psychiatrist had examined and analyzed the underlying data. Defense Exhibit 243–4 was merely evidence that CIBA–GEIGY did not *always* require the principal investigator to sign off on PRFs for which the underlying exam was performed by another physician—here the Wisconsin psychiatrist residents.

The exhibit had little to do with Garfinkel's position before the jury, nor did it refute the government's position. The government nev-

er contended that the principal investigator *must* always sign off on all PRFs regardless of whether another physician performs the visit. Instead, the government contended that the psychiatrist performing the visit must always sign off on the PRF and hence, Garfinkel's lone signature on a PRF is a representation that he had performed the underlying visit. We cannot say that the district court abused its discretion when it refused to admit Exhibit 243–4.

### III. THE GOVERNMENT'S CROSS–APPEAL

■ Garfinkel's presentence report recommended that Garfinkel's sentence be enhanced two levels for the abuse of a special skill pursuant to U.S.S.G. § 3B1.3. The district court refused to grant the enhancement, agreeing with Garfinkel that his special skills as a psychiatrist were not abused to perpetrate the crimes, but rather, his managerial skills were abused. The government argues that the district court misinterpreted the scope of the guidelines, thus mandating a de novo standard of review. *See United States v. Lange,* 918 F.2d 707, 710 n. 2 (8th Cir. 1990). Garfinkel argues that whether § 3B1.3 applies to his conduct is a factual determination, requiring a clearly erroneous standard of review. *See United States v. Brelsford,* 982 F.2d 269, 271 (8th Cir.1992).

We agree with Garfinkel that whether the enhancement applies is in this case a factual determination. The district court made a factual determination that Garfinkel's skills as a psychiatrist were not used to perpetrate the frauds. *Cf. United States v. Muzingo,* 999 F.2d 361, 362 (8th Cir.) (§ 3B1.3 enhancement appropriate where the district court made a factual determination that an acquired skill was used to break into safe deposit boxes), *cert. denied,* —— U.S. ——, 114 S.Ct. 575, 126 L.Ed.2d 474 (1993). We cannot say that the district court's finding is clearly erroneous, and thus we affirm Garfinkel's sentence.

### IV. CONCLUSION

We affirm Garfinkel's convictions on counts two, three, five, twenty-one, and twen-

ty-three, and we affirm the sentence imposed by the district court.