UNITED STATES of America, Plaintiff–Appellee/Cross–Appellant,

v.

Sanford WEINSTOCK, Defendant–Appellant/Cross–Appellee.

Nos. 96–2474, 96–2521.

United States Court of Appeals, Sixth Circuit.

Argued March 13, 1998.

Decided May 27, 1998.*

---

**16.** Fed.R.Civ.P. 60(b)(6).

**17.** 635 F.2d 396 (5th Cir.1981).

**18.** *Id.* at 402.

* This decision was originally issued as an "unpublished decision" filed on May 27, 1998.

Richard M. Lustig (argued and briefed), Richard M. Lustig Law Office, Birmingham, MI, for Appellant.

Stephen J. Murphy, III (argued and briefed), Office of the U.S. Attorney, Detroit, MI, for Appellee.

Before: RYAN, COLE, and GILMAN, Circuit Judges.

GILMAN, Circuit Judge.

Podiatrist Sanford Weinstock appeals from his jury conviction on twenty-six counts of mail fraud in connection with a scheme to defraud Blue Cross Blue Shield of Michigan ("Blue Cross") by filing claims for medical procedures that he did not perform. The government cross-appeals, claiming that the district court erred in declining to enhance Weinstock's sentence.

For the following reasons, the judgment of the district court is in all aspects AFFIRMED.

## I. BACKGROUND

Weinstock practices podiatry in Southeastern Michigan. On June 27, 1995, the government indicted Weinstock on twenty-six counts mail fraud in violation of 18 U.S.C. § 1341. The indictment alleged that as a part of a fraudulent scheme, Weinstock "would perform routine foot care and other services and would bill for treatments and surgical procedures that were not performed on the subscriber/patients, such as arthrocentesis procedures."

Dennis McKee, a fraud investigator for Blue Cross, testified that Blue Cross covers arthrocentesis procedures up to $85.00 for the first procedure and approximately one half of that amount for the second procedure. Arthrocentesis involves inserting a needle that either extracts fluid from or places fluid into a joint. McKee noted that podiatrists generally perform this procedure on the feet and occasionally on the hands of patients.

McKee began investigating Weinstock after receiving a tip from Blue Cross's fraud hot line. He interviewed twenty-nine patients, including the six patients who later testified at the trial. After completing the

interviews, McKee gathered the Blue Cross records for these patients. At trial, McKee discussed the contents of these records by using various charts which indicated the diagnosis and treatment performed.

During the cross-examination of McKee, Weinstock's attorney asked who had interpreted the records obtained from Weinstock pursuant to the grand jury subpoena. McKee replied that Weinstock had refused to interpret the records for him. After McKee's response, Weinstock's attorney requested that the jury be excused. He then moved for a mistrial on the basis that McKee had impermissibly commented upon Weinstock's right against self-incrimination under the Fifth Amendment. The district court denied the motion.

Dr. George Gropian also testified on behalf of the government. He defined arthrocentesis to be the puncture of a joint space. Gropian testified that arthrocentesis is usually performed either to withdraw fluid or to treat inflammatory conditions of the joint by injecting certain anti-inflammatory medicines. The government then questioned Gropian about a Physician Practice Profile prepared by and introduced through McKee that compared the number of arthrocentesis procedures billed by Weinstock with the number performed by other podiatrists in the community. After considering the information, Gropian testified that Weinstock billed for many more arthrocentesis procedures than either Gropian or any of his peers. Gropian noted that, on average, he performed three arthrocentesis per day as compared to the ten allegedly performed by Weinstock. Gropian opined that Weinstock would have had to be a specialist in arthrocentesis in order to legitimately perform so many procedures per day.

The government then called the six patients whose treatment was at issue. These patients testified about the medical services they received from Weinstock. As its final witness, the government called Deborah Blair, the FBI agent investigating the case. Through Blair's testimony, the government introduced charts outlining all of the arthrocentesis procedures billed by Weinstock. The charts also separated the billings for the arthrocentesis procedures billed to the six testifying patients during each office visit. During her testimony, Blair conceded that the first arthrocentesis billed for each visit appeared to have actually been performed.

On May 15, 1996, the jury returned a verdict finding Weinstock guilty on each count of mail fraud listed in the indictment. Weinstock then moved for a judgment of acquittal and a new trial on the same grounds asserted in this appeal. On September 9, 1996, the district court denied his motion. The district court held a sentencing hearing on November 14, 1996 and sentenced Weinstock to three years of supervised release, with the first five months to be served in custody. Weinstock was also ordered to pay $29,000 in restitution and $10,000 as a fine. During the sentencing hearing, the government requested a two-level enhancement pursuant to U.S.S.G. § 3B1.3 for Weinstock's alleged use of a special skill to facilitate the crime. The district court initially granted the enhancement, but after additional deliberation reconsidered and rejected the government's request.

On appeal, Weinstock argues that the district court erred in denying his motion for a new trial. Weinstock first argues the district court committed reversible error by admitting into evidence certain charts containing statistical data. Weinstock also claims that the evidence offered at trial impermissibly varied from the indictment. Finally, Weinstock contends that the trial was unfair because his fifth amendment right against self-incrimination was compromised when McKee testified about Weinstock's silence. The government cross-appeals, contending that the district court erred by not enhancing Weinstock's sentence pursuant to U.S.S.G. § 3B1.3

## II.  ANALYSIS

### A.  The Evidentiary Questions

**1.  The Physician Practice Profile.** Weinstock challenges the government's introduction of statistical data generated from Blue Cross computers that is referred to as a Physician Practice Profile. This profile listed all of the arthrocentesis procedures billed

by Weinstock as well as all other participating podiatrists in the same community. In addition, the government summarized the information in several charts that were also admitted into evidence. Weinstock objected to the introduction of this profile and the accompanying summary charts. On appeal, Weinstock requests a new trial on the following grounds: (1) the profile failed to meet the requirements of Rule 803(6) of the Federal Rules of Evidence because McKee could not testify as to the procedures used in gathering and verifying the information; (2) the introduction of the profile violated Rule 404(b) of the Federal Rules of Evidence by introducing evidence relating to other acts used for the purpose of proving his character "in order to show action in conformity therewith"; and (3) the probative value of the profile was substantially outweighed by the risk of unfair prejudice in violation of Rule 403 of the Federal Rules of Evidence.

*i. Rule 803(6) of the Federal Rules of Evidence.* As discussed in *Redken Laboratories, Inc. v. Levin,* 843 F.2d 226, 229 (6th Cir.1988), a business record must satisfy the following four requirements in order to be admissible under Rule 803(6):

(1) it must have been made in the course of a regularly conducted business activity; (2) it must have been kept in the regular course of that business; (3) the regular practice of that business must have been to have made the memorandum; and (4) the memorandum must have been made by a person with knowledge of the transaction or from information transmitted by a person with knowledge.

*Id.* at 229. The custodian of the records, however, "need not be in control of or have individual knowledge of the particular corporate records ..., but need only be familiar with the company's recordkeeping practices." *In re Custodian of Records of Variety Distrib., Inc.,* 927 F.2d 244, 248 (6th Cir.1991).

Weinstock argues that McKee could not testify as to the nature of the other podiatrists' practices, particularly what percentage of their practices included surgery. He claims that without the ability to cross-examine McKee on this issue, the statistical data was misleading. Moreover, Weinstock

contends that McKee had no personal knowledge of whether Blue Cross instituted any measures to ensure the accuracy of the data in the Physician Practice Profile.

Weinstock's argument ultimately goes to the weight to be afforded to the evidence rather than to its admissibility. The Physician Practice Profile consists of data entered in the regular course of business. McKee testified that Blue Cross receives claims from doctors, enters the information from these claims into its computer, and then sends payments to the subscribing doctor. When Blue Cross wants to compare the billing procedures of a particular type of doctor, it can retrieve the information from the computer and compile a profile. Although McKee personally did not know how Blue Cross performed the safety checks, he was aware that Blue Cross had procedures in place to check the accuracy of the records. Finally, McKee noted that profiles are often distributed to doctors to inform them of their standing within their peer group. Blue Cross also regularly uses the profile to identify problems, including the fraudulent billing of claims by individual doctors.

Rule 803(6) does not require that the custodian personally gather, input, and compile the information memorialized in a business record. Records prepared in the course of regularly conducted business activity are particularly reliable because the person preparing the record has an incentive to be accurate. Fed.R.Evid. 803(6) advisory committee's note. The custodian of the record need only be "familiar with the record keeping system." *Hathaway,* 798 F.2d at 906. As is evident from his testimony, McKee satisfies this requirement.

Accordingly, we conclude that the district court did not err in admitting the Physician Practice Profile pursuant to Rule 803(6).

*ii. Rule 404(b) of the Federal Rules of Evidence.* Weinstock claims that the Physician Practice Profile introduced evidence concerning other acts in violation of Rule 404(b), which provides in relevant part that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in con-

formity therewith." Such evidence is admissible, however, if it is offered to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.*

In *United States v. Chesney,* 86 F.3d 564, 572 (6th Cir.1996), this court provided a roadmap for considering the introduction of other acts pursuant to Rule 404(b):

> To admit Rule 404(b) evidence, the district court must first determine as a matter of fact whether there is sufficient evidence that the prior act occurred. We review this factual determination under an abuse of discretion standard. Then the district court must determine as a matter of law whether the other act evidence is admissible as evidence of motive, intent, knowledge, or for some other lawful purpose. We review this legal determination de novo. Finally, the district court must determine whether the probative value of the other act evidence is outweighed by its unfairly prejudicial effect. We review this determination for an abuse of discretion.

*Id.* at 572.

Weinstock argues that the profile "drew an inference as to similar acts against the Defendant that were not charged in the indictment.... The inference being that because he billed so much for this procedure, that necessarily all of his billings were false." The government argues in response that the information relating to Weinstock's billing practices was intrinsic to the mail-fraud offenses alleged in the indictment and therefore did not constitute 404(b) materials. In the alternative, the government contends that the evidence was admissible to prove Weinstock's scheme to defraud the government.

■ In support of its argument that the profile was admissible as information intrinsic to the allegations listed in the indictment, the government points out that the 1991 advisory committee note to Rule 404(b) states that "[t]he amendment does not extend to evidence of acts which are 'intrinsic' to the charged offense." Fed.R.Evid. 404(b) advisory committee's note. In other words, "Rule 404(b) is not implicated when the other crimes or wrongs evidence is part of a continuing pattern of illegal activity." *United States v. Barnes,* 49 F.3d 1144, 1149 (6th Cir.1995).

The indictment in this case charged Weinstock with using the mail in furtherance of a scheme to defraud Blue Cross. The alleged scheme entailed submitting claims to Blue Cross for arthrocentesis procedures not performed and then receiving payments for those claims through the mail. The profile indicating the total amount of money paid by Blue Cross to Weinstock for all of his arthrocentesis procedures is evidence of the very scheme alleged in the indictment, rather than evidence of other acts.

The mail fraud scheme involved filing claims and receiving payments. The profile introduced by the government provided the jury with evidence intrinsic to that scheme— the number of claims filed by Weinstock and the payments he received. As noted in *United States v. Roberts,* 548 F.2d 665, 667 (6th Cir.1977), "[t]he jury is entitled to know the 'setting' of a case. It cannot be expected to make its decision in a void-without knowledge of the time, place and circumstances of the acts which form the basis of the charge." *Id.* at 667. Weinstock's filing of additional claims beyond the twenty-six alleged in the indictment are thus a part of the setting and circumstances forming the basis of the charge.

In the recent case of *United States v. Comer,* 93 F.3d 1271 (6th Cir.1996), this court considered a similar legal question. The defendant in *Comer* was a postal worker accused of stealing goods that were sent through the mail and then selling them to other postal employees. *Id.* at 1274. The government charged Comer in a seven-count indictment, four of the counts alleging the embezzlement of articles from registered mail pouches. *Id.* During the trial, the government sought to introduce testimony regarding uncharged jewelry sales occurring during the same time frame alleged in the indictment. *Id.* at 1277. This court held that the evidence was admissible "[b]ecause the proof showed that the defendant operated an ongoing scheme of stealing items of jewelry from the mail and selling them to

employees of the postal service, the contested testimony is directly related to the crime charged." *Id.* at 1278. Accordingly, this court determined that the evidence was properly introduced and the district court's decision to permit the testimony was affirmed.

In this case, as in *Comer,* the introduction of the Physician Practice Profile memorialized acts that were part of Weinstock's ongoing scheme to commit mail fraud. The profile thus does not include "other acts" as defined by Rule 404(b).

**■   iii.   Rule 403 of the Federal Rules of Evidence.** Finally, we must consider whether the probative value in admitting the Physician Practice Profile is substantially outweighed by the risk of unfair prejudice. Fed.R.Evid. 403. As was noted in *United States v. Hathaway,* 798 F.2d 902 (6th Cir. 1986), " '[u]nfair prejudice' within [the] context [of Rule 403] means an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* at 909 (quoting Fed.R.Evid. 403 advisory committee's note).

The Physician Practice Profile did not suggest an improper basis upon which the jury decided the case. Instead, the profile was used to provide a context for the jury to evaluate the allegations against Weinstock. While the profile is detrimental to the merits of Weinstock's case, it provides competent evidence of the charges of fraud. If all evidence adverse to a defendant was subject to exclusion under Rule 403, then no government evidence would ever be deemed admissible. The test under Rule 403 is not whether the evidence is detrimental, but whether it is so unfairly prejudicial as to substantially outweigh its probative value. We find no such unfair prejudice with the profile in question, especially because Weinstock had an opportunity to argue to the jury about the weight it should give the document. Accordingly, we find no abuse of discretion in the district court's decision to admit the Physician Practice Profile.

**■   2.   The Summary Evidence.** Weinstock also challenges the summary evidence introduced at the end of the trial through the testimony of Agent Blair. These charts summarized Blue Cross records concerning Weinstock's billing practices, including the six patients who testified at trial. The summaries included the names of the patients, the dates of their appointments, the procedure for which Weinstock billed Blue Cross, the amount of money Blue Cross paid Weinstock, and the approximate mailing date of the payment. This information was gathered from a combination of Weinstock's patient charts and Blue Cross billing records.

Weinstock argues that the probative value of these charts was substantially outweighed by their prejudicial effect, especially because the testifying patients had only limited recollection of the treatment they received on the dates in question. But the charts facilitated the jury's consideration of the testimony of the patients and other witnesses, and the reliability of the underlying data goes to the weight rather than to the admissibility of the evidence. Although the charts were admittedly detrimental to Weinstock's defense, their probative value was not substantially outweighed by any risk of unfair prejudice. Fed.R.Evid. 403.

The district court therefore did not abuse its discretion by admitting the summary charts into evidence.

**B.   Variance from the Indictment**

Weinstock contends that he was ambushed by a shift in the government's theory of the case. He claims that the indictment alleged that all of the arthrocentesis claims he filed with Blue Cross were for procedures never performed. At trial, however, the government presented evidence attempting to prove that on each occasion when he billed for two arthrocentesis procedures on the same day, he never performed the second procedure.

The Supreme Court has plainly stated that when the crime charged is a felony, "the Fifth Amendment requires that prosecution be begun by indictment." *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). In a later decision the Court provided additional insight by commenting that "[c]onvictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indict-

ment. A part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as 'a useless averment' that 'may be ignored.'" *United States v. Miller*, 471 U.S. 130, 136, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985) (quoting *Ford v. United States*, 273 U.S. 593, 602, 47 S.Ct. 531, 71 L.Ed. 793 (1927)). This court has noted that "[e]very variation between an indictment and proof at trial does not create reversible error. A variation that has the effect of actually or constructively amending the indictment requires reversal, whereas one that adds nothing to the indictment, while a variance, may constitute harmless error." *United States v. Zelinka*, 862 F.2d 92, 96 (6th Cir.1988).

A distillation of the above cases establishes the principle that if the evidence offered at trial proves a narrower scheme than the one alleged in the indictment, then the variance is not fatal. *Id.* at 97. Variances "will not result in reversal unless 'substantial rights' of a defendant have been affected." *United States v. Hathaway*, 798 F.2d 902, 910–11 (6th Cir.1986). Substantial rights are impacted only when the defendant demonstrates "prejudice to his ability to defend himself at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions." *Id.* at 911 (quoting *Miller*, 471 U.S. at 138 n. 5, 105 S.Ct. 1811). A variance may require reversal if it "create[s] 'a substantial likelihood' that a defendant may have been 'convicted of an offense other than that charged by the grand jury.'" *Id.* (quoting *United States v. Beeler*, 587 F.2d 340, 342 (6th Cir.1978)).

The Supreme Court in *Miller*, for example, reinstated a conviction reversed by the Ninth Circuit where the evidence at trial did not prove all of the charges in the indictment. Miller was charged with conspiring to have his home burglarized and then misrepresenting the value of the missing goods to the insurance company. 471 U.S. at 131–32, 105 S.Ct. 1811. At trial, the prosecution offered proof only on the latter charge. *Id.* at 132, 105 S.Ct. 1811. The jury then convicted him on this charge. *Id.* at 133–34, 105 S.Ct. 1811. The Ninth Circuit reversed the conviction because of the variance between the trial

evidence and the indictment. *Id.* at 134, 105 S.Ct. 1811. The Supreme Court reinstated the conviction, holding that the defendant was convicted based on a charge that was clearly set out in the indictment. *Id.* Hence, the Court found that insofar as the evidence "narrow[s] the indictment's charges without adding any new offense[s]," the conviction may stand. *Id.* at 138, 105 S.Ct. 1811.

In the instant case, Weinstock claims that he was unable to defend himself as a result of the variance. He contends that he was prepared to prove reasonable doubt regarding the prosecution's theory that all the arthrocentesis procedures billed on each day were fraudulent, but was unprepared to defend himself based on the government's shift in its theory of the case. As an initial matter, nowhere does the indictment claim that all of the arthrocentesis claims on each day were fraudulent. Indeed, the indictment simply alleged that Weinstock "would bill for treatments and surgical procedures that were not performed." Accordingly, it is difficult to interpret the government's theory of the case as shifting. Even if we were to assume that Weinstock's position was correct, the government's trial theory consisted of a *narrowing* of the charge in the indictment. *Zelinka*, 862 F.2d at 96. As the Supreme Court stated in *Miller*, the government does not have to prove every charge in the indictment. 471 U.S. at 136–37, 105 S.Ct. 1811. Those charges not proven by the government are simply ignored.

Accordingly, we reject Weinstock's argument and conclude that the government's theory of the case did not impermissibly vary from the charge in the indictment.

## C. Fifth Amendment Right Against Self-Incrimination

Weinstock argues that the district court committed reversible error by denying his motion for a mistrial when a prosecution witness commented on Weinstock's silence. McKee testified that during his investigation of Weinstock, he considered certain medical records that were subpoenaed through the grand jury. During the cross-examination of McKee, Weinstock's counsel asked McKee who had interpreted the medical records. In

response to this line of questioning, McKee responded that he had attempted to get Weinstock to interpret the records, but that Weinstock "wouldn't talk to us." The defense immediately requested a mistrial, claiming that the testimony violated Weinstock's fifth amendment right against self-incrimination. The Fifth Amendment states in pertinent part that "No person shall be ... compelled in any criminal case to be a witness against himself."

The government argues that McKee's response was foreseeable. It also contends that the prosecution did not "use" Weinstock's silence against him because McKee's response was elicited from a question by Weinstock's own counsel and was followed by an immediate defense objection. The government further asserts that because Weinstock did not request a curative instruction, he must not have believed at the time that he was prejudiced by the statement.

This court previously has considered the impact of defense counsel eliciting a comment on the defendant's silence from a prosecution witness. In *United States v. Griffith*, 756 F.2d 1244 (6th Cir.1985), a co-defendant's counsel asked a government witness the following question: "[Y]ou know that Mr. Reynolds [a co-defendant] can testify in these proceedings don't you?" *Id.* at 1253. The government witness responded, "He sure can." *Id.* Relying on *United States v. Whitley*, 734 F.2d 1129 (6th Cir.1984), this court held "that the defendant's right to remain silent was not impaired when the comment on his silence was made by a codefendant's counsel, not by the prosecutor." *Griffith*, 756 F.2d at 1253.

In *Whitley*, this court similarly held that testimony elicited by co-defendant's counsel did not violate the defendant's constitutional rights. 734 F.2d at 1136–37. In that case, counsel for a co-defendant asked the government witness whether he conducted any additional investigation into the identity of the parties to the drug transaction at issue. *Id.* at 1135. The government witness responded, "I know of nothing to look into unless Mr. Hucks had wanted to tell me something that I could look into." *Id.* Defendant Hucks argued that this testimony violated his right

to remain silent. The district court denied the motion for a mistrial and gave a curative instruction to the jury. This court concluded that no constitutional violation occurred because the testimony was in response to a defense question rather than the prosecution's, the judge gave a curative instruction, and there was "no allegation that the government in any manner attempted to emphasize, highlight, refer to, or utilize the testimony." *Id.* at 1136–37. This court found that error would occur only if the prosecution emphasized the defendant's silence in order to "imply a consciousness of guilt." *Id.* at 1137.

In addition, the Supreme Court in *Greer v. Miller*, 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987), indicated that courts should consider the extent of the damage caused by the comment in question. In *Greer*, the prosecutor asked the defendant how old he was. The defendant replied that he was 23. The prosecutor then asked, "Why didn't you tell this story to anybody when you got arrested?" *Id.* at 759, 107 S.Ct. 3102. The defendant immediately moved for a mistrial, but the trial judge denied the motion and instead gave curative instructions to the jury. On appeal, the Supreme Court upheld the conviction and noted that "the court explicitly sustained an objection to the only question that touched upon [the defendant's] postarrest silence. No further questioning or argument with respect to Miller's silence occurred, and the court specifically advised the jury that it should disregard any questions to which an objection was sustained." *Id.* at 764, 107 S.Ct. 3102. The dissent criticized the Court for setting a precedent that a single comment could never violate the Constitution. *Id.* at 769, 107 S.Ct. 3102 (Brennan, J., dissenting). In response, the majority commented, "we hold that the sequence of events at the trial, beginning with the single comment—but including particularly the proper and immediate action by the trial court, and the failure by defense counsel to require more specific instructions—indicates that [the defendant's] postarrest silence was not *used* against him within the meaning of *Doyle*." *Id.* at 764 n. 5, 107 S.Ct. 3102 (emphasis added).

We believe that the proper resolution of Weinstock's mistrial argument is controlled by the above cases. In both *Griffith* and *Whitley,* this court addressed the impact of isolated references to the defendant's silence by defense counsel. The court concluded that the prosecution did not use the defendant's silence in a manner prohibited by the Fifth Amendment. As in *Greer,* McKee's statement was isolated and never exploited by the government. Accordingly, we affirm the district court's denial of Weinstock's motion for a mistrial.

## D. Sentence Enhancement

The government filed a cross-appeal, arguing that the district court erred by not enhancing Weinstock's offense level by two levels for using a "special skill" within the meaning of U.S.S.G. § 3B1.3. The government contends that "a doctor's ability to choose between similar billing codes for insurance submissions involves use of a 'special skill.'" U.S.S.G. § 3B1.3 provides: "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." A special skill "refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." U.S.S.G. § 3B1.3 Application Note 2.

█ "We review a district court's factual finding regarding application of § 3B1.3 for clear error." *United States v. Atkin,* 107 F.3d 1213, 1219 (6th Cir.1997). While admitting that being a podiatrist gave him the opportunity to submit false bills, Weinstock argues that his podiatric skill did not facilitate the crime within the meaning of the sentencing guidelines.

█ Weinstock's status as a podiatrist, standing alone, does not automatically mean that he used his medical skills to facilitate the crime. *United States v. Gandy,* 36 F.3d 912, 915–16 (10th Cir.1994) (holding that "the mere fact that a defendant possesses a special skill is not enough to warrant his sentence being enhanced"). In *United States v. Garfinkel,* 29 F.3d 1253 (8th Cir.1994), a psychiatrist was convicted of making false statements to the government and for mail fraud. *Id.* at 1254–55. These crimes revolved around a study of psychiatric drugs commissioned by the government. The defendant was charged with crimes that included making statements on patients' medical charts that indicated that the defendant had examined the patient when he had not done so, and mailing a letter containing false statements about the defendant's actions with regard to the study. The government moved for an enhancement pursuant to U.S.S.G. § 3B1.3 for the defendant's use of a "special skill." *Id.* at 1261. The district court held that the defendant had used his managerial skills rather than his medical skills to perpetrate the crime, and the Eighth Circuit affirmed the district court's holding. *Id.; see United States v. Hickman,* 991 F.2d 1110, 1111 (3d Cir.1993) (finding that a building contractor did not use his special skill to facilitate a "garden variety fraud" when he received payment on a contract to construct a home that he never built).

The instant case is similar to *Garfinkel* and *Hickman.* Weinstock did not use his podiatric skills to facilitate the crime. Although performing unnecessary medical procedures requires a special skill, refraining from providing such services and falsely billing therefore does not. Because the district court's conclusion is not clearly erroneous, we affirm its refusal to enhance Weinstock's sentence.

## III. CONCLUSION

For the reasons discussed above, the judgment of the district court is AFFIRMED.